**No. 25-30653**

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

PELNOR, L.L.C., FORMERLY KNOWN AS PELLERIN, INCORPORATED,

PLAINTIFF – APPELLEE/CROSS-APPELLANT

v.

FIRST STATE INSURANCE COMPANY,

DEFENDANT – APPELLANT/CROSS-APPELLEE

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA, NO. 2:21-CV-958

---

**BRIEF OF APPELLANT/CROSS-APPELLEE,**
**FIRST STATE INSURANCE COMPANY**

---

SUBMITTED BY:

Wilson L. Maloz, III (LA Bar No. 26396)
Estelle C. Eiserloh (LA Bar No. 40353)
THE WALTZ LAW GROUP
1100 Poydras Street
Suite 2620 – Energy Centre
New Orleans, Louisiana 70163
Telephone: (504) 264-5260

Counsel for Appellant/Cross-Appellee,
First State Insurance Company

**No. 25-30653**

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

PELNOR, L.L.C., FORMERLY KNOWN AS PELLERIN, INCORPORATED,

PLAINTIFF – APPELLEE/CROSS-APPELLANT

v.

FIRST STATE INSURANCE COMPANY,

DEFENDANT – APPELLANT/CROSS-APPELLEE

---

**CERTIFICATE OF INTERESTED PERSONS**

---

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**DEFENDANT – APPELLANT/CROSS-APPELLEE**

First State Insurance Company, a Connecticut corporation, is wholly owned by Heritage Holdings, Inc., a Connecticut corporation, which is, in turn, wholly owned by The Hartford Insurance Group, Inc. ("HIG"), a Delaware corporation. HIG is a publicly traded corporation that has no parent corporation, is listed on the

New York Stock Exchange under the symbol HIG, and is a constituent element of the S&P 500 Index. To the best of HIG's knowledge, no publicly held corporation currently owns 10% or more of its stock. This statement is based solely on the absence of required filings with the SEC for investors acquiring an ownership interest of 10% or greater of HIG common stock and speaks solely as of today's date.

**COUNSEL FOR DEFENDANT – APPELLANT/CROSS-APPELLEE**

Wilson L. Maloz, III
Estelle C. Eiserloh
The Waltz Law Group

**PLAINTIFF – APPELLEE/CROSS-APPELLANT**

Pelnor, L.L.C. is a limited liability company organized under the laws of the State of Louisiana. Counsel for Pelnor, L.L.C. has advised that James Willis Pellerin is the majority member of Pelnor, L.L.C., that the remaining minority members include various individual members and various trust members, that no publicly held corporation owns 10% or more of the interest of Pelnor, L.L.C., and that it believes this information satisfies the requirements of Fifth Circuit Rule 28.2.1.

**COUNSEL FOR PLAINTIFF – APPELLEE/CROSS-APPELLANT**

David M. Bienvenu, Jr.
John Allain Viator
Bienvenu, Foco & Viator, LLC

*—and—*

Barrye Panepinto Miyagi
Taylor, Porter, Brooks and Phillips, LLP

***s/ Wilson L. Maloz III***
**Attorney of Record for Appellant/Cross-Appellee, First State Insurance Company**

## **STATEMENT REGARDING ORAL ARGUMENT**

The issues in controversy between Appellant/Cross-Appellee, First State Insurance Company, and Appellee/Cross-Appellant, Pelnor, L.L.C., formerly known as Pellerin, Incorporated, involve complex insurance coverage concepts to be decided as a matter of law on undisputed facts on *de novo* review, as well as an interrelated cross-appeal by Pelnor, L.L.C. seeking to overturn the District Court's finding of fact that the arguments and positions of First State Insurance Company were in good faith throughout the matter.

First State Insurance Company requests oral argument due to the complexity of the insurance coverage issues and its fundamental interest in sustaining the finding of fact that it has acted in good faith at all times.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ..............................................v

TABLE OF CONTENTS..........................................................................................vi

TABLE OF AUTHORITIES ...................................................................................ix

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF ISSUES FOR REVIEW .............................................................2

STATEMENT OF THE CASE ................................................................................3

I. Pre-Tender Timeframe (May 12, 2021 - Mar. 16, 2022) ...............................3

II. Post-Tender/Pre-Amendment Timeframe (Mar. 16, 2022 - Mar. 25, 2024)....................................................................4

III. Post-Amendment Timeframe (Mar. 25, 2024 Forward) ................................5

IV. Settlement With Plaintiff Sentilles ..................................................................6

V. Cross-Motions for Summary Judgment..........................................................7

VI. Bench Trial, Findings of Fact & Conclusions of Law, and Judgments ...........................................................................................7

VII. Rulings Presented for Review .........................................................................9

VIII. Relevant Provisions of the Umbrella Liability Policy.....................................9

SUMMARY OF THE ARGUMENT ....................................................................13

STANDARD OF REVIEW ...................................................................................15

ARGUMENT ....................................................................................................17

I. Judgment as a Matter of Law Regarding First State's Obligations Under the Umbrella Liability Policy Is Appropriate. ....................................17

II. The Rules for Interpretation of the Umbrella Liability Policy Are Set Out in the Louisiana Supreme Court's *Arceneaux II* Decision, Which Considered Nearly Identical Policy Language. ..................................18

III. First State Is Only Responsible Under the Umbrella Liability Policy for Pro-Rata Allocated Defense Costs, 24.42%, Based On Time-On-The-Risk for the Pre-Amendment Timeframe. ..............................19

A. The Obligation to Pay or Reimburse Defense Costs Arises When They Are Incurred, Based on the Allegations Pending at the Time..........................................................................20

B. The Language of the Umbrella Liability Policy and the Louisiana Supreme Court's *Arceneaux II* Decision Applying Nearly Identical Language Dictate That First State Owed 24.42% of Pre-Amendment Defense Costs. ....................21

C. Both Equity and Public Policy Considerations Expressly Set Forth by the Louisiana Supreme Court in *Arceneaux II* Also Dictate That First State Owed 24.42% of Pre-Amendment Defense Costs. ........................................................25

D. Alternatively, If the Louisiana Supreme Court's *Arceneaux II* Decision Does Not Dictate That First State Owed 24.42% of Pre-Amendment Defense Costs Under the Language of the Umbrella Liability Policy, Then Its *Arceneaux I* Decision Does. .....................................26

IV. First State Is Not Responsible for Any Pre-Tender Defense Costs Under the Umbrella Liability Policy Because Pelnor Did Not Comply With Its Notice Duties. ...................................................................29

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................32

CERTIFICATE OF SERVICE ........................................................................33

CERTIFICATE OF COMPLIANCE...................................................................34

# TABLE OF AUTHORITIES

**Cases** **Page**

*Anco Insulations, Inc. v. Royal Indem. Ins. Co.*
2010 WL 4394147 (M.D. La. Nov. 1, 2010) .......... 30-31

*Arceneaux v. Amstar Corp.*
200 So. 3d 277(La. 2016) .......... 2, 9, 13, 18-28, 32

*Arceneaux v. Amstar Corp.*
66 So. 3d 438 (La. 2011) .......... 13, 19-20, 26-28, 32

*Becker v. Tidewater, Inc.*
586 F.3d 358 (5th Cir. 2009) .......... 15

*Burlington Ins. Co. v. Houston Cas. Co.*
2023 WL 2375361 (E.D. La. Mar. 6, 2023) .......... 21

*Celotex Corp. v. Catrett*
477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .......... 17

*Century Surety Co. v. Colgate Operating, LLC*
116 F.4th 345 (5th Cir. 2024) .......... 15-16

*Cobb v. Empire Fire and Marine Ins. Co.*
488 So. 2d 349 (La. App. 3d Cir. 1986) .......... 29-30

*Congious v. Shaw*
170 F.4th 960 (5th Cir. 2026) .......... 15

*Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*
73 F.4th 322 (5th Cir. 2023) .......... 16

*Diversified Group, Inc. v. Van Tassel*
806 F.2d 1275 (5th Cir. 1987) .......... 17

*Donahue v. Republic Nat'l Distrib. Co., LLC*
489 F. Supp. 3d 455 (E.D. La. 2020) .......... 21

*Edwards v. Daugherty*
883 So. 2d 932 (La. 2004) ....................................................................19

*First Colony Life Ins. Co. v. Sanford*
555 F.3d 177 (5th Cir. 2009) ...............................................................15

*Gabarick v. Laurin Maritime (America), Inc.*
635 F. Supp. 2d 499 (E.D. La. 2009) ....................................................20

*Gruver v. Louisiana Through Board of Supervisors of LSU A&M*
654 F. Supp. 3d 539 (M.D. La. 2023) ....................................................17

*Guar. Nat. Ins. Co. v. Vic Mfg. Co.*
143 F.3d 192 (5th Cir. 1998) ...............................................................21

*Guerrera v. United Financial Cas. Co.*
161 F.4th 913 (5th Cir. 2025) ..............................................................18

*Gully & Assoc., Inc. v. Wausau Ins. Cos.. et al.*
536 So. 2d 816 (La. App. 1st Cir. 1988) ........................................ 29-31

*Jeter v. Ameron Int'l Corp.*
324 So. 3d 201 (La. App. 4th Cir. 2021) ........................................ 21-22

*Lamar Advertising Co. v. Continental Cas. Co.*
396 F.3d 654 (5th Cir. 2005) ...............................................................18

*Le v. United States*
138 F.4th 264 (5th Cir. 2025) ..............................................................15

*Liberty Mutual Ins. Co. v. Jotun Paints, Inc.*
2009 WL 86669 (E.D. La. Jan. 13, 2009) ....................................... 30-31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ......................16

*Murray Architects, Inc. v. Scottsdale Ins. Co.*
2011 WL 5878148 (E.D. La. Nov. 23, 2011)...........................................17

*Norfolk Southern Corp. v. California Union Ins. Co.*
859 So.2d 167 (La. App. 1st Cir. 2003) ....................................................19, 27

*Nucor Steel Louisiana, LLC v. HDI Global Ins. Co.*
2022 WL 1773866 (E.D. La. June 1, 2022) ..................................... 14, 30-31

*Payton v. St. John*
188 So. 2d 647 (La. App. 2d Cir. 1966) ........................................... 14, 29-31

*Peavey Co. v. M/V ANPA v. Zurich Ins. Co.*
971 F.2d 1168 (5th Cir. 1992) ..........................................................................31

*Renwick v. PNK Lake Charles, L.L.C.*
901 F.3d 605 (5th Cir. 2018) ............................................................................18

*Rhodes v. Chicago Ins. Co.*
719 F.2d 116 (5th Cir. 1983) ............................................................................21

*Sims v. Mulhearn Funeral Home, Inc.*
956 So. 2d 583 (La. 2007) ................................................................................18

*So. Silica of La., Inc. v. La. Ins. Guar. Ass'n*
979 So. 2d 460 (La. 2009) ............................................................................19, 27

*Sossamon v. Lone Star State of Texas*
560 F.3d 316 (5th Cir. 2009) ............................................................................17

*Spitzfaden v. Daigle Welding Serv., Inc.*
607 So. 2d 951 (La. App. 4th Cir. 1992) ..........................................................21

*Transcontinental Pipe Line Corp. v. National Union Fire Ins. Co.*
378 F. Supp. 2d 729 (M.D. La. 2005) ..................................................... 30-31

**Statutes**

28 U.S.C. §1332 .......................................................................................................1

28 U.S.C. §1291 .......................................................................................................1

**Rules**

Federal Rule of Appellate Procedure 3 ....................................................... 15

Federal Rule of Civil Procedure 56 ....................................................... 17

**Other Authority**

Federal Practice and Procedure (Wright & Miller) § 2720 (4th ed. 2022)............. 17

## STATEMENT OF JURISDICTION

The District Court had subject-matter jurisdiction over this matter under 28 U.S.C. §1332 as there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00. This Court has jurisdiction over this appeal under 28 U.S.C. §1291 as it is an appeal of a final judgment of all aspects of the Cross-Claim of Appellee/Cross-Appellant, Pelnor, L.L.C., against Appellant/Cross-Appellee, First State Insurance Company, entered by the United States District Court for the Eastern District of Louisiana on October 29, 2025, for which First State Insurance Company timely filed a Notice of Appeal on November 5, 2025. ROA.15220-15221. The District Court issued an Amended Judgment on December 10, 2025, for which Pelnor, L.L.C. timely filed a Notice of Appeal on December 11, 2025, and for which First State Insurance Company timely filed an Amended Notice of Appeal on December 18, 2025. ROA.15252-15253, 15257.

## STATEMENT OF ISSUES FOR REVIEW

1. Given that the Louisiana Supreme Court established pro-rata allocation of defense costs among insurers based on percentage of time-on-the-risk for long-term personal injury exposure across multiple policy periods in *Arceneaux v. Amstar Corp.*, 200 So. 3d 277 (La. 2016), did the District Court err as a matter of law when it considered policy language nearly identical to that in *Arceneaux*, but held First State Insurance Company responsible for 100% of defense costs for a timeframe during which its policy period encompassed only 24.42% of the alleged exposure time?

2. Did the District Court err as a matter of law when it held First State Insurance Company responsible for defense costs incurred prior to its first receipt of notice of the lawsuit?

## STATEMENT OF THE CASE

The underlying matter is a long-term asbestos exposure personal injury lawsuit by Plaintiff, Robert Stephen Sentilles, against multiple Defendants, including Pelnor, L.L.C., formerly known as Pellerin Milnor Corporation ("Pelnor"). First State Insurance Company ("First State") is one of Pelnor's liability insurers that was eventually made a Defendant by Plaintiff and a Cross-Defendant by Pelnor as Cross-Claimant after approximately three years of litigation. First State and Pelnor ultimately together settled Plaintiff's claims against them. First State always paid the defense costs of Pelnor that it determined were owed in good faith, and Pelnor continued prosecuting its Cross-Claim for additional amounts that First State will establish herein were not owed under the language of its liability insurance policy and applicable law, including governing law of the Louisiana Supreme Court.

First State and Pelnor recognized that their defense costs dispute is one of law, and in the interest of judicial economy, agreed to stipulated facts for cross-motions for summary judgment and then later for a bench trial. ROA.11634-11638, 15107-15109, 15147, 15178-15187. The following facts are undisputed stipulations:

### I. Pre-Tender Timeframe (May 12, 2021 - Mar. 16, 2022)

Plaintiff Sentilles filed his lawsuit in Louisiana state court on May 14, 2021 against multiple Defendants, including Pelnor, and alleged exposure to asbestos at its facility from approximately 1974 through 1983. ROA.15371, 15374. The lawsuit

was removed to the Eastern District of Louisiana on May 18, 2021. ROA.77. Pelnor engaged two law firms for its defense and incurred $236,000 in reasonable and necessary defense costs by March 16, 2022. ROA.11636, 15179, 15182.

Pelnor did not provide first notice of the lawsuit to First State until this date, March 16, 2022, nearly a year after suit had been filed. ROA.11636, 15179. First State denies any obligation to pay any pre-tender defense costs, whereas Pelnor contends that First State is obligated to pay 100%. ROA.11636, 15180.

## II. Post-Tender/Pre-Amendment Timeframe (Mar. 16, 2022 - Mar. 25, 2024)

Following first receipt of notice on March 16, 2022, First State issued correspondence to Pelnor on May 10, 2022 in which it agreed to participate in the defense of the instant lawsuit under Umbrella Liability Policy No. 901090 issued to Pellerin Milnor Corporation for the policy period May 31, 1973 to May 31, 1976 ("Umbrella Liability Policy"). ROA.15387-15392. Because there is no underlying insurance that provides coverage, First State agreed, subject to a reservation of rights, to pay its appropriate share of reasonable and necessary post-tender defense costs. ROA.11636, 15179, 15387-15392. First State did not, at any time, deny coverage or refuse to participate in the defense of Pelnor on the grounds that its notice was late. ROA.11636, 15108.

Based on the asbestos exposure dates alleged in Plaintiff Sentilles' original Petition (approx. 1974 to 1983) and the policy period of the Umbrella Liability

Policy (May 31, 1973 to May 31, 1976), First State determined that it owed 24.42% of post-tender reasonable and necessary defense costs based on its percentage of time-on-the risk. ROA.11636, 15181. First State paid 24.42% of these reasonable and necessary defense costs incurred by the two law firms engaged by Pelnor for its defense between first receipt of notice on March 16, 2022 and March 25, 2024. ROA.15182.

Pelnor does not dispute First State's 24.42% calculation of percentage of time-on-the-risk, but contends that First State is obligated to pay the full 100%, which First State denies. ROA.15181. The parties agree that the 75.58% not paid by First State amounts to $112,000 as of March 25, 2024 when Plaintiff Sentilles amended his alleged asbestos exposure dates. ROA.15182.

### III. Post-Amendment Timeframe (Mar. 25, 2024 Forward)

On March 25, 2024, Plaintiff Sentilles filed a Third Amended, Restated, and Superseding Complaint in which he named First State as a Defendant under the Louisiana Direct Action Statute, La. R.S. 22:1269, and also limited his alleged asbestos exposure dates against Pelnor to trigger only the policy period of the Umbrella Liability Policy. ROA.9848, 9853, 9867-9868. Days later, on March 28, 2024, Pelnor filed a Cross-Claim against First State alleging *inter alia* that First State is "obligated to provide . . . a complete defense to Pelnor," is "required to defend and indemnify Pelnor," that the "claims asserted by Plaintiff against Pelnor have

been properly tendered by Pelnor to First State for complete defense and indemnity," and that Pelnor "is entitled to recover past and future defenses costs," and further prayed for "all past and future defense costs incurred by Pelnor in defending this action not previously paid by First State." ROA.9898, 9901-9903.

First State did not dispute that once Plaintiff Sentilles filed his Third Amended, Restated, and Superseding Complaint that altered the alleged period of asbestos exposure attributable to Pelnor to a shorter time-frame that triggered only First State's policy period, then First State became responsible for 100% of reasonable and necessary defense costs from the date of filing, March 25, 2024. ROA.11636. From that date forward, First State paid 100% of reasonable and necessary defense costs submitted by Pelnor, and only the pre-tender defense costs and 75.58% of the post-tender/pre-amendment defense costs not paid by First State are in dispute. ROA.15181-15182.

## IV. Settlement With Plaintiff Sentilles

Per the Assistance and Cooperation provision of the Umbrella Liability Policy, First State associated with Pelnor in the defense and control of the claim and proceeding. ROA.11636-11637, 15180. First State and Pelnor cooperated fully to negotiate a full and final settlement of Plaintiff Sentilles' claims for an amount authorized by First State, which was entered into on or about September 5, 2024. ROA.11636-11637, 15180. First State paid 100% of the settlement amount because

post-amendment, its then-current time-on-the-risk for the alleged exposure attributable to Pelnor was 100%. ROA.11636-11637, 15180.

## V. Cross-Motions for Summary Judgment

Their litigation with Plaintiff Sentilles resolved, First State and Pelnor mutually recognized that there was no dispute regarding the relevant facts, and they agreed to Stipulations for cross-motions for summary judgment on the issues involving disputed defense costs. ROA.11634-11638. Cross-motions were filed on September 18, 2024, oppositions were filed on November 6, 2024, and reply memoranda were filed on January 7, 2025. ROA.10666, 11612, 13721, 13744, 13882, 13893.

On January 20, 2025, the District Court issued an Order & Reasons, found as a matter of law on undisputed facts that First State should be responsible for 100% of pre-tender defense costs and 100% of post-tender/pre-amendment defense costs, and made interlocutory rulings denying summary judgment to First State and granting partial summary judgment to Pelnor on its Cross-Claims. ROA.13953. First State requested that the District Court certify its interlocutory ruling for interlocutory appeal, which was denied. ROA.15087, 15137.

## VI. Bench Trial, Findings of Fact & Conclusions of Law, and Judgments

First State and Pelnor kept and supplemented their previous Stipulations by agreeing to additional Trial Stipulations and Stipulated Admissible Exhibits as well

as Uncontested Material Facts regarding the defense costs dispute in the Pre-Trial Order (mainly as to agreed amounts for pre-tender and post-tender/pre-amendment defense costs). ROA.15107-15109, 15147, 15178-15187. A bench trial was held on September 17, 2025, which consisted of entry of stipulated facts and joint exhibits into the record and oral closing arguments of counsel. ROA.15188, 15259.

On October 24, 2025, the District Court issued Findings of Fact & Conclusions of Law, denied reconsideration of the interlocutory grant of partial summary judgment in favor of Pelnor, held as a matter of law on undisputed facts that First State should be responsible for 100% of pre-tender defense costs and 100% of post-tender/pre-amendment defense costs, and ordered that there be judgment in favor of Pelnor in the amount of $236,000 for pre-tender defense costs and $112,000 for post-tender/pre-amendment defense costs, reduced by $10,000 for Pelnor's self-insured retention, for a total award of $338,000. ROA.15206. The District Court also made a Finding of Fact that First State acted in good faith at all times in disputing Pelnor's claim for defense costs beyond what First State determined was owed and which First State paid, which Pelnor is cross-appealing. ROA.15206.

Final Judgment was entered on October 29, 2025, for which First State timely filed a Notice of Appeal on November 5, 2025. ROA.15220, 15221. The District Court issued an Amended Judgment to award interest on December 10, 2025. ROA.15252. Pelnor timely filed a Notice of Appeal on December 11, 2025.

ROA.15253. And First State timely filed an Amended Notice of Appeal on December 18, 2025. ROA.15257.

## VII. Rulings Presented for Review

First State presents all adverse rulings against it described above for review by this Court. These include the Order & Reasons of January 20, 2025 denying summary judgment to First State and granting partial summary judgment to Pelnor, the Conclusions of Law of October 24, 2025 and award of $338,000 to Pelnor, the Judgment of October 29, 2025, and the Amended Judgment of December 10, 2025.

## VIII. Relevant Provisions of the Umbrella Liability Policy

The entirety of the Umbrella Liability Policy was introduced into the record at trial as Exhibit 1. ROA.15355-15370. The provisions relevant to the defense costs issues on appeal, which are nearly identical to the dispositive provisions in the governing Louisiana Supreme Court case *Arceneaux v. Amstar Corp.*, 200 So. 3d 277 (La. 2016), were also part of the Stipulations for the cross-motions for summary judgment.

Per Stipulation No. 4, the relevant Insuring Agreements of the Umbrella Liability Policy state:

> 1. Coverage
>
> The Company agrees to indemnify the insured for ultimate net loss in excess of the retained limit hereinafter stated, subject to the limitations, conditions and other terms of this policy, which the insured may sustain

> by reason of the liability imposed upon the insured by law, or assumed by the Insured under contract on account of:
>
> (a) Personal Injury Liability
>
> For damages and expenses including damages for care and loss of services, to which this insurance applies, because of personal injury, including death resulting therefrom, **which occurs during the policy period,** sustained by any person or persons, caused by an occurrence;

The language of this provision was amended by endorsement, and the only substantive change was to add "which occurs during the policy period." (Emphasis added to show addition.) ROA.11634-11635, 15364, 15367.

Per Stipulation No. 5, the Definition of "Ultimate Net Loss" in the Umbrella Liability Policy is:

> **4. Ultimate Net Loss**
>
> "Ultimate Net Loss" means the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the Insured is liable either by adjudication or compromise with the written consent of the Company, including after making proper deduction for all recoveries and salvages collectible, all loss expenses and legal expenses (including attorneys' fees, court costs and interests on any judgment or award) but excludes all salaries of employees and office expenses of the insured, the Company or any underlying insurer so insured.

ROA.11635, 15369.

Per Stipulation No. 6, the Definition of "Occurrence" in the Umbrella Liability Policy is:

> 8. Occurrence
>
> With respect to Coverages 1(a) and 1(b) "occurrence" shall mean an accident or event including continuous or repeated exposure to conditions which results~~, during the policy period,~~ in personal injury or property damage neither expected nor intended from the standpoint of the Insured. For the purpose of determining the limit of the Company's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

The language of this provision was amended by endorsement, and the only substantive change was to remove "during the policy period" as indicated.[1] ROA.11635, 15365, 15369.

The Definition of "Personal Injury" in the Umbrella Liability Policy is:

> **3. Personal Injury**
>
> "Personal Injury" means (1) bodily injury, sickness disease, disability, shock, mental anguish and mental injury; (2) false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution or humiliation; (3) unless arising out of any advertising activities, libel, slander, defamation of character or invasion of rights of privacy.

ROA.15369.

Additionally, the following provisions are relevant. Per Endorsement #3, the Notice of Occurrence Condition in the Umbrella Liability Policy states:

---

[1] The strikethrough text in this quote is for clarity to show the change from the original language of the Definition of "Occurrence" to the amended language in the endorsement, which moved the "during the policy period" phrase from the Definition of "Occurrence" to the Insuring Agreements. The Definition in the endorsement does not expressly show the text stricken through.

> D. Notice of Occurrence: Upon the happening of an occurrence reasonably likely to involve the Company hereunder, written notice shall be given as soon as practicable to the Company or any of its authorized agents. Such notice shall contain particulars sufficient to identify the Insured and the fullest information obtainable at the time.
>
> The Insured shall give like notice of any claim made on account of such occurrence. If legal proceedings are begun the Insured, when requested by the Company, shall forward to it each paper thereon, or a copy thereof, received by the Insured or the Insured's representatives, together with copies of reports of investigations made by the Insured with respect to such claim proceedings.

ROA.15366.

Finally, the Actions Against Company and Assistance and Co-operation Conditions in the Umbrella Liability Policy provide:

> **E. Action Against Company:** No action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.
>
> **F. Assistance and Co-operation:** Except as provided in Insuring Agreement II (Retained Limit – Limit of Liability) with respect to the exhaustion of the aggregate limit(s) of the underlying policy(ies) listed in Schedule A, or in Condition I. (Underlying Insurance), the Company shall not be called up on assume charge of the settlement or defense of any claim made or proceedings instituted against the Insured; but the Company shall have the right and opportunity to associate with the Insured in the defense and control of any claim or proceedings reasonably likely to involve the Company. In such event the Insured and the Company shall cooperate fully.

ROA.15370.

## SUMMARY OF THE ARGUMENT

The facts are undisputed and were stipulated to by the parties. The dispute over insured defense costs before this Court for *de novo* review involves purely legal issues governed by settled law, including controlling precedent from the Louisiana Supreme Court, that was not applied correctly by the District Court.

The District Court incorrectly held as a matter of law that First State owed 100% of defense costs during the litigation timeframe when its Umbrella Liability Policy's policy period only insured 24.42% of the overall alleged asbestos exposure period. This is contrary to what the Louisiana Supreme Court established under nearly identical operative policy language, and also principles of equity and public policy—that an insurer is only responsible for pro-rata allocated defense costs based on its percentage of time-on-the-risk. *Arceneaux v. Amstar Corp.*, 200 So. 3d 277 (La. 2016).

In addition, the Louisiana Supreme Court has further established under the same nearly identical operative policy language that pro-rata allocation of defense costs based on percentage of time-on-the-risk applies regardless of whether the insurer's obligation to pay defense costs was pursuant to a duty to defend or a duty to indemnify for defense costs. *Arceneaux v. Amstar Corp.*, 66 So. 3d 438 (La. 2011). Under either *Arceneaux* decision, or both, First State only owed 24.42% of defense costs for the litigation timeframe when its Umbrella Liability Policy's policy period

only insured this percentage of the overall alleged asbestos exposure period. The District Court therefore erred as a matter of law when it held First State responsible for 100%, which this Court can remedy on *de novo* review by reversing and holding that the 24.42% of defense costs already paid by First State satisfied its defense obligation for the timeframe at issue.

Further, Pelnor did not comply with the notice requirements of the Umbrella Liability Policy and incurred significant defense costs, $236,000, before providing first notice to First State. The District Court incorrectly held as a matter of law that First State nevertheless still owed 100% of these defense costs. This is contrary to settled Louisiana law, applied time and time again by state and federal courts, going back to the 1960's and continuing through as recently as a few years ago. *Payton v. St. John*, 188 So. 2d 647 (La. App. 2d Cir. 1966); *Nucor Steel Louisiana, LLC v. HDI Global Ins. Co.*, 2022 WL 1773866 (E.D. La. June 1, 2022).

As such, because Pelnor failed to comply with its notice duties, First State is not responsible for defense costs incurred prior to first receiving notice. The District Court therefore erred as a matter of law when it held First State responsible for 100%, which this Court can remedy on *de novo* review by reversing and holding that First State does not owe Pelnor for defense costs incurred prior to notice.

As a matter of law, First State has already paid in good faith everything owed to Pelnor under Louisiana law, which this Court should find under *de novo* review.

## STANDARD OF REVIEW

An appellant such as First State may appeal a denial of a motion for summary judgment when the appellee's motion for summary judgment was granted. *Congious v. Shaw*, 170 F.4th 960, 963 (5th Cir. 2026). A notice of appeal "encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order. It is not necessary to designate those orders in the notice of appeal." *Id.* (citing Fed. R. App. Proc. 3(c)(4)). Accordingly, First State's Notice of Appeal and Amended Notice of Appeal encompass all District Court orders included in the final judgment: both the grant of Pelnor's motion and the denial of First State's. *Id.*

The Fifth Circuit reviews District Court judgments rendered on cross-motions for summary judgment based on joint stipulations of facts *de novo*. *Century Surety Co. v. Colgate Operating, LLC*, 116 F.4th 345, 348-49 (5th Cir. 2024) (citing *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 180 (5th Cir. 2009)). Also, "[t]his Court reviews 'findings of fact for clear error and conclusions of law *de novo*' when handling a bench trial appeal." *Le v. United States*, 138 F.4th 264, 273 (5th Cir. 2025). Review of an earlier interlocutory denial of summary judgment after a bench trial is *de novo*. *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 & n.4 (5th Cir. 2009).

Thus, the standard of review for all aspects of the defense costs dispute, which was decided by the District Court as a matter of law based on undisputed facts, is *de novo*.

Additionally, "[o]n cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Century Surety*, 116 F.4th at 349 (citing *Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 327 (5th Cir. 2023)). As such, when reviewing the District Court's grant of Pelnor's motion, this Court should take First State's evidence as true and construe all facts and justifiable inferences in the light most favorable to First State. *Id.* Any reasonable doubts must be resolved in First State's favor. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

# ARGUMENT

## I. Judgment as a Matter of Law Regarding First State's Obligations Under the Umbrella Liability Policy Is Appropriate.

Under Federal Rule of Civil Procedure 56, summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law. *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009). Regarding the standard for cross-motions for summary judgment on undisputed facts:

> The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard. Both motions must be denied if the court finds that there is a genuine dispute of material fact. **But if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment.**
>
> *Gruver v. Louisiana Through Board of Supervisors of LSU A&M*, 654 F. Supp. 3d 539, 545 (M.D. La. 2023) (emphasis added; internal quoting omitted; citing Federal Practice and Procedure (Wright & Miller) § 2720 (4th ed. 2022)).

"Under Fed.R.Civ.P. 56 summary judgment is appropriate where the facts are not in dispute and the issue before the court poses a purely legal question." *Diversified Group, Inc. v. Van Tassel*, 806 F.2d 1275, 1277 (5th Cir. 1987); *see also Murray Architects, Inc. v. Scottsdale Ins. Co.*, 2011 WL 5878148, *4 (E.D. La. Nov.

23, 2011). When material facts are undisputed, an insurer's obligations that involve "purely legal determinations" are "ripe for summary judgment." *Id.*

## II. **The Rules for Interpretation of the Umbrella Liability Policy Are Set Out in the Louisiana Supreme Court's *Arceneaux II* Decision, Which Considered Nearly Identical Policy Language.**

Louisiana law governs the interpretation of the Umbrella Liability Policy. *See, e.g., Lamar Advertising Co. v. Continental Cas. Co.*, 396 F.3d 654, 659 (5th Cir. 2005). In a "diversity case governed by Louisiana law, *de novo* review does not mean that we write on a blank slate." *Guerrera v. United Financial Cas. Co.*, 161 F.4th 913, 916 (5th Cir. 2025). "In determining Louisiana law, we 'should first look to final decisions of the Louisiana Supreme Court.'" *Id.* (citing *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018)). And in the case that directly governs this matter because, as established *infra*, it analyzed policy language nearly identical to that in the Umbrella Liability Policy, *Arceneaux v. Amstar Corp.*, 200 So. 3d 277 (La. 2016) ("*Arceneaux II*"), the Louisiana Supreme Court stated:

> It is well-settled that 'an insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code.' *Sims v. Mulhearn Funeral Home, Inc.*, 07–0054 (La. 5/22/07), 956 So.2d 583, 588–89. According to those rules, it is the responsibility of the judiciary to determine the common intent of the parties. The ascertainment of that common intent begins with an examination of the words of the insurance contract itself. *Id.* In this case, the words of the insurance contract at issue are clear and unambiguous.
>
> . . .
>
> We note also that 'subject to the rules on insurance contract interpretation, insurance companies have the right to limit coverage in any manner they desire,

so long as the limitations do not conflict with statutory provisions or public policy.' *Edwards v. Daugherty*, 03–2103, 03–2104 (La. 10/1/04), 883 So.2d 932, 947.

*Arceneaux II*, 200 So. 3d at 286.

## III. First State Is Only Responsible Under the Umbrella Liability Policy for Pro-Rata Allocated Defense Costs, 24.42%, Based On Time-On-The-Risk for the Pre-Amendment Timeframe.

Pelnor contends that First State is responsible for reimbursing it for 100% of pre-amendment defense costs. However, prior to Plaintiff Sentilles filing his Third Amended, Restated, and Superseding Complaint on March 25, 2024,[2] the allegations of asbestos exposure attributable to Pelnor were for 1974 through 1983, while the Umbrella Liability Policy policy period is May 31, 1973 to May 31, 1976, i.e., 24.42% of the overall alleged exposure period as stipulated by the parties. And it is settled law in Louisiana that an insurer is only responsible for a pro-rata allocation of defense costs based on the percentage of its time-on-the-risk. *Arceneaux II*.[3]

The Louisiana Supreme Court's seminal *Arceneaux* cases establish that an insurer is only responsible for a pro-rata allocation of responsibility for indemnity (*Arceneaux I*) and also specifically for defense costs (*Arceneaux II*). *Arceneaux II*,

---

[2] First State does not dispute that it is responsible for 100% of defense costs incurred after Plaintiff filed the Third Amended, Restated, and Superseding Complaint on March 25, 2024 and has fully paid Pelnor for these defense costs accordingly.

[3] *See also Arceneaux v. Amstar Corp.*, 66 So. 3d 438 (La. 2011) (*Arceneaux I*); *So. Silica of La., Inc. v. La. Ins. Guar. Ass'n*, 979 So. 2d 460 (La. 2009); *Norfolk Southern Corp. v. California Union Ins. Co.*, 859 So.2d 167, 197-98 (La. App. 1st Cir. 2003) ("insurers may limit their liability to discrete and finite periods"; "All damages emanating from occurrences taking place outside the policy period are covered by the [other] insurer on the risk at the time the occurrence took place.").

200 So. 3d at 282-89 ("Defense costs are divided among insurers, and if the insured has periods of non-coverage, the insured is responsible for its pro rata share."). The Louisiana Supreme Court also established in *Arceneaux II* that the formula for pro-rata allocation of defense costs is based on the insurer's percentage of time-on-the-risk without factoring in monetary policy limits. *Id.* at 289. *Arceneaux II* discusses and explains *Arceneaux I*, so in the interest of efficiency and to avoid confusion, unless necessary for a particular point, First State will cite only to *Arceneaux II* herein.

### A. The Obligation to Pay or Reimburse Defense Costs Arises When They Are Incurred, Based on the Allegations Pending at the Time.

As a threshold matter, an insurer is obligated to reimburse or pay defense costs as they are incurred because "[a]n insured becomes legally obligated to pay defense costs when the legal services are rendered." *Gabarick v. Laurin Maritime (America), Inc.*, 635 F. Supp. 2d 499, 511 (E.D. La. 2009). This is because the insurer is "liable" to pay them. *Id.* And this matches the relevant language of the Ultimate Net Loss provision of the Umbrella Liability Policy:

> "Ultimate Net Loss" means the sum actually paid or payable in cash . . . for which the Insured is **liable** . . . including . . . all loss expenses and legal expenses . . . including attorneys' fees, court costs . . . .

*See supra*, p.10. (Emphasis added.)

And the scope of an insurer's obligation for defense costs is determined by the allegations of the plaintiff against the insured currently pending at the time the

defense costs are incurred; amended allegations in subsequent pleadings apply only to the insurer's obligation for defense costs going forward, not retroactively. *Rhodes v. Chicago Ins. Co.*, 719 F.2d 116, 119-121 (5th Cir. 1983).[4]

As such, First State in good faith paid 24.42% of Pelnor's defense costs as they were submitted for the post-tender/pre-amendment timeframe, and then in good faith paid 100% of the post-amendment defense costs. And for the reasons set forth in Section IV *infra*, First State in good faith further declined to pay any pre-tender defense costs incurred before Pelnor's first notice to First State.

### B. The Language of the Umbrella Liability Policy and the Louisiana Supreme Court's *Arceneaux II* Decision Applying Nearly Identical Language Dictate That First State Owed 24.42% of Pre-Amendment Defense Costs.

First State's determination that it owed 24.42% of pre-amendment defense costs was not only in good faith, it was based soundly on the Louisiana Supreme Court's *Arceneaux II* decision interpreting policy language nearly identical to that in the Umbrella Liability Policy. And far from the impermissible windfall for First State that Pelnor has mischaracterized this as, it is dictated by the Supreme Court:

> Although Appellant argues that applying *Arceneaux* leads to an unjust windfall for insurers, this case presents the precise scenario contemplated within

[4] The notion that historical defense costs already paid would have to be reassessed every time plaintiffs amend their allegations, repeatedly even—as likely to result in insureds owing money back as in insurers owing more—is non-sensical, as recognized by decades of caselaw subsequent to *Rhodes*. *See Burlington Ins. Co. v. Houston Cas. Co.*, 2023 WL 2375361, *6 (E.D. La. Mar. 6, 2023) (citing *Guar. Nat. Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 194 n.15 (5th Cir. 1998)); *Donahue v. Republic Nat'l Distrib. Co., LLC*, 489 F. Supp. 3d 455, 469 (E.D. La. 2020); *Spitzfaden v. Daigle Welding Serv., Inc.*, 607 So. 2d 951, 955 (La. App. 4th Cir. 1992).

> *Arceneaux* – a long latency disease claim due to workplace exposure to asbestos. Application of the pro rata method in this matter comports with the parties' "reasonable expectations," as the terms of the contracts, discussed in the preceding section [nearly identical to those in the Umbrella Liability Policy herein], ensure that 'neither party could reasonably expect that the insurer was liable for losses that occurred outside the policy coverage periods.'

*Jeter v. Ameron Int'l Corp.*, 324 So. 3d 201, 211 (La. App. 4th Cir. 2021) (citing *Arceneaux II*, 200 So. 3d at 286).

When determining in *Arceneaux II* that an insurer is only responsible for a pro-rata allocation of defense costs based on its percentage of time-on-the-risk, the Louisiana Supreme Court based its decision on the following liability policy language, deliberately choosing to emphasize "during the policy period":

> The relevant policy language provides:
>
> > The company will pay on behalf of the insured all sums which the insured ... shall become legally obligated to pay as damages because of
> >
> > > Y. bodily injury
> > >
> > > Z. property damage
> >
> > to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent ....
>
> The policy defines bodily injury as "bodily injury, sickness or disease sustained by any person which occurs *during the policy period*, including death at any time resulting therefrom." (Emphasis added.) The policy defines occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

*Arceneaux II*, 200 So. 3d at 280 (ellipses and italics emphasis in original).

The operative language of the Umbrella Liability Policy, including "during the policy period," is nearly identical:

> The Company agrees to indemnify the insured for ultimate net loss . . . which the insured may sustain by reason of the liability imposed upon the insured by law . . . on account of:
>
> . . . damages and expenses . . . to which this insurance applies, because of personal injury, including death resulting therefrom, which occurs *during the policy period*, sustained by any person or persons, caused by an occurrence;
>
> . . .
>
> "Personal Injury" means (1) bodily injury, sickness, disease, disability, shock, mental anguish and mental injury;
>
> . . .
>
> . . . "occurrence" shall mean an accident or event including continuous or repeated exposure to conditions which results in personal injury or property damage neither expected nor intended from the standpoint of the Insured.
>
> *See supra*, p.10-11. (Emphasis added, to match the Louisiana Supreme Court's added emphasis in *Arceneaux II*.)

Each operative phrase may be arranged slightly differently in the respective policies, but the effect is the same:

| **Policy in *Arceneaux II*** | **Umbrella Liability Policy** |
|---|---|
| bodily injury | bodily injury |
| which occurs during the policy period | which occurs during the policy period |
| including death at any time resulting therefrom | including death resulting therefrom |
| caused by an occurrence | caused by an occurrence |

The Louisiana Supreme Court characterized this as not only unambiguous, but "precise language," and under this "precise language" shared by the liability policy in *Arceneaux II* and the Umbrella Liability Policy, the Louisiana Supreme Court held that defense costs must be allocated pro-rata based on percentage of time-on-the-risk. *Id.* at 286-89. And although a different result might be required under different policy language, the matching dispositive "precise language" dictates a matching result for the Umbrella Liability Policy. *Id.* at 286.

Granted, *Arceneaux II* involved a policy with a duty to defend while the Umbrella Liability Policy involves a duty to pay or reimburse defense costs, but this is a distinction without a difference because the Louisiana Supreme Court's reasoning and conclusions were not based on any such distinctions. Rather, they were based on an insuring agreement and definitions of "bodily injury" and "occurrence" nearly identical to those in the Umbrella Liability Policy. The unimportance of the basis for *why* defense costs were owed, versus the relevance of the fact *that* defense costs were owed, is further established by the many instances in which the Louisiana Supreme Court discussed defense costs generally in *Arceneaux II* without any specific reference to duty to defend.[5]

[5] For example: "Nationwide, two general approaches to **allocation of defense costs** in long latency disease cases have emerged: the pro rata allocation method and the joint and several allocation method. Under pro rata allocation, insurance carriers of triggered policies are responsible for a **share of defense costs** based at least in part on the period of time they are on the risk. **Defense costs** are divided among insurers, and if the insured has periods of non-coverage, the insured is responsible for its pro rata share." *Id.* at 282. "In *Forty–Eight Insulations*, the court applied the

As such, the language of the Umbrella Liability Policy and the Louisiana Supreme Court's *Arceneaux II* decision applying nearly identical language dictate that First State owed 24.42% of pre-amendment defense costs.

### C. Both Equity and Public Policy Considerations Expressly Set Forth by the Louisiana Supreme Court in *Arceneaux II* Also Dictate That First State Owed 24.42% of Pre-Amendment Defense Costs.

The policy language of the Umbrella Liability Policy matching that in *Arceneaux II* is dispositive. But even beyond that, the Louisiana Supreme Court also recognized that pro-rata allocation of defense costs is an "equitable system that can readily be used in long latency disease claims in Louisiana." *Id.* at 287. "To hold otherwise would entitle an insured to receive coverage for a period in which it did not pay a premium." *Id.*

And what the *Arceneaux II* majority described as equitable, Justice Crichton characterized as public policy, for anything but pro rata allocation "would permit American Sugar [the insured] to obtain defense coverage for a period it did not even pay a premium for insurance." *Id.* at 291 (Crichton, J. concurring). That is precisely what Pelnor is erroneously trying to do to First State here for pre-amendment defense

---

exposure theory to indemnity liability, and stated that the exposure theory established that a reasonable means of proration was available in **allocating defense costs**." *Id.* at 285. "We are persuaded by the reasoning presented in *Forty–Eight Insulations* and its progeny and adopt the pro rata **allocation method for defense costs** in the case before us **based on the policy language**." *Id.* at 286 (emphasis added).

costs incurred while asbestos exposure allegations attributable to Pelnor extended years beyond the First State policy period to periods where either Pelnor was self-insured and/or insured by others—but this is precisely what *Arceneaux II* prohibits.

### D. Alternatively, If the Louisiana Supreme Court's *Arceneaux II* Decision Does Not Dictate That First State Owed 24.42% of Pre-Amendment Defense Costs Under the Language of the Umbrella Liability Policy, Then Its *Arceneaux I* Decision Does.

First State has established *supra* that pro-rata allocation of defense costs based on percentage of time-on-the-risk, 24.42% in this case, applies under *Arceneaux II*. But should the Court find that it does not apply to pre-amendment defense costs as defense costs *per se* under *Arceneaux II*, then it still applies under *Arceneaux I*, which established that pro-rata allocation based on time-on-the-risk applies generally to indemnity obligations in insurance policies.

The Insuring Agreements of the Umbrella Liability Policy obligate First State "to indemnify the insured [Pelnor] for ultimate net loss," and Ultimate Net Loss includes "the sum actually paid or payable in cash . . . for which the Insured is liable . . . including . . . all loss expenses and legal expenses . . . including attorneys' fees, court costs . . . ." *See supra*, p.10-11. Put simply, while First State did not have a duty *to defend* Pelnor, it was obligated *to indemnify* Pelnor for Pelnor's defense costs as Pelnor paid them or incurred them.

And before discussing time-on-the-risk allocation of defense costs specifically, the Louisiana Supreme Court in *Arceneaux II* discussed time-on-the-

risk allocation for such indemnity obligations generally under several prior cases, including *Arceneaux I*:

> **As to an insurer's duty to indemnify, liability is to be prorated among insurance carriers that were on the risk during periods of exposure to injurious conditions.** That indemnification is allocated pro rata is based in large part on Louisiana's adoption of the exposure theory in long latency disease cases. Long latency occupational disease cases are sui generis in that a distinct body of jurisprudential law has been developed which applies solely to them. Under the exposure theory, the "occurrence" that triggers coverage under an insurance policy is the plaintiff's exposure to harmful conditions within the policy period. Such a theory was adopted to establish when coverage was triggered in cases that involved diseases when there is a "lengthy temporal separation between the alleged tortious conduct and the appearance of injury." This approach is based on the concept that **insurers may limit their liability to discrete and finite periods**. As the Norfolk Southern court explained:
>
> > The exposure theory, upon which the Louisiana allocation approach is based, relies on the principle that **an insurer will only be responsible within the terms of its policy for those damages arising out of the period the policy is in effect. In short, each insurer is responsible, up to the limits of its policy, for all damages emanating from occurrences taking place during the insurer's policy period. All damages emanating from occurrences taking place outside the policy period are covered by the insurer on the risk at the time the occurrence took place.**
>
> Further, in cases when claims arise out of occurrences that take place during a period in which no insurer is on the risk, a liable entity is assigned a pro rata share for purposes of indemnification.
>
> . . . **the aforementioned case law pertains to indemnification** . . . .
>
> *Arceneaux II*, 200 So. 3d at 282 (emphasis added, internal citations omitted, citing *Arceneaux I*, 66 So. 3d at 453; *So. Silica of La.*, 979 So. 2d at 466; *Norfolk Southern*, 859 So. 2d at 197-98).

After the Louisiana Supreme Court set forth this explanation of indemnity obligations generally per *Arceneaux I* in *Arceneaux II*, it then proceeded to apply the

same reasoning under the same relevant policy language, again nearly identical to that in the Umbrella Liability Policy, to defense costs. And perhaps most importantly, when doing so, the Louisiana Supreme Court stated:

> [w]hile the duty to defend is broader than the duty to indemnify, neither obligation is broader than the policy's coverage period in the context of long latency disease cases that trigger occurrence-based polices.
>
> *Id.* at 286.

As such, the Louisiana Supreme Court has expressly instructed that whether defense costs are owed directly under a duty to defend or are reimbursable under a duty to indemnify, allocating the proper percentage of time-on-the-risk to an insurer based on its coverage period—and not going beyond that coverage period—is the most important consideration.

Requiring First State to indemnify Pelnor for 100% of pre-amendment defense costs when its coverage period constituted only 24.42% of the time-on-the-risk as alleged during the pre-amendment timeframe would therefore violate the Louisiana Supreme Court's pronouncements of Louisiana law in both *Arceneaux I* and *Arceneaux II* by making First State's obligation to indemnify for defense costs during that timeframe broader than its coverage period. Pelnor's attempt to have First State pay for defense costs allocatable outside of its coverage period for the pre-amendment timeframe must therefore fail as a matter of law.

## IV. First State Is Not Responsible for Any Pre-Tender Defense Costs Under the Umbrella Liability Policy Because Pelnor Did Not Comply With Its Notice Duties.

Pelnor incurred significant defense costs, $236,000, prior to providing notice to First State. ROA.15182. Pelnor did not timely comply with the Notice of Occurrence provision of the Umbrella Liability Policy. ROA.11636, 15179. And because Pelnor did not timely comply with the Notice of Occurrence provision, First State should not be obligated to reimburse pre-notice defense costs.

Many state and federal cases have held under Louisiana law that an insurer is not responsible for defense costs incurred by an insured prior to the insured providing notice to the insurer. These cases look not at any duties of the insurer, but rather at the insured's failure to comply with its contractual notice duties. *Gully & Assoc., Inc. v. Wausau Ins. Cos.. et al.*, 536 So. 2d 816, 817-18 (La. App. 1st Cir. 1988) (citing *Cobb v. Empire Fire and Marine Ins. Co.*, 488 So. 2d 349 (La. App. 3d Cir. 1986) and *Payton v. St. John*, 188 So. 2d 647 (La. App. 2d Cir. 1966)).

In *Gully*, the Louisiana First Circuit stated: "This case involves a single issue: Whether a liability insurer must reimburse its insured for defense costs and attorney fees incurred in defending a claim prior to the date on which the insured notifies the insurer of the claim." *Id.* at 817. Relying on its own prior caselaw, as well as the fact that the Louisiana "Second and Third Circuits have reached the same result in

similar cases," the Louisiana First Circuit held that an insurer is not responsible for defense costs incurred by an insured prior to its first tender of notice. *Id.* at 818.

And like the pro-rata allocation rule discussed *supra*, this rule, and the cases establishing it, do not turn on the nature of the defense provisions in the respective insurance policies, nor on any distinction between an insurer's duty to defend versus an obligation to indemnify for defense costs. Importantly, they do not turn on any duty of the *insurer* at all. Rather, the prohibition on reimbursement of pre-notice defense costs is based on the failure of the *insured* to comply with its contractual notice duty:

> In *Cobb,* the court found that the insurer had no duty to pay attorney fees until notice was given. In *Payton,* the court relieved the insurer of any obligation to pay attorney fees prior to notice. The court based its ruling on the insured's breach of its contractual duty to report the lawsuit. The trial judge in the case *sub judice* relied on *Cobb* in determining that Employers [the insurer] was not liable for pre-notification defense costs and attorney fees. The trial court did not err in this determination.

*Gully*, 536 So. 2d at 817.

Federal courts in the Fifth Circuit have applied the rule from *Gully* many times. *See, e.g., Nucor Steel Louisiana, LLC v. HDI Global Ins. Co.*, 2022 WL 1773866, *4 (E.D. La. June 1, 2022).[6] And whether or not First State was prejudiced by Pelnor's failure is not a factor, for prejudice is only a factor if an insurer denies

[6] *See also Anco Insulations, Inc. v. Royal Indem. Ins. Co.*, 2010 WL 4394147, *2-3 (M.D. La. Nov. 1, 2010); *Liberty Mutual Ins. Co. v. Jotun Paints, Inc.*, 2009 WL 86669, n.26 (E.D. La. Jan. 13, 2009); *Transcontinental Pipe Line Corp. v. National Union Fire Ins. Co.*, 378 F. Supp. 2d 729, 740 (M.D. La. 2005).

liability coverage or attempts to assert late notice as a basis for denying liability coverage.[7] *Peavey Co. v. M/V ANPA v. Zurich Ins. Co.*, 971 F.2d 1168, 1178 (5th Cir. 1992).[8]

It is undisputed that First State did not deny coverage to Pelnor or attempt to assert late notice as a basis for denying coverage. ROA.11636, 15108. As such, First State is not responsible for any pre-tender defense costs.[9]

---

[7] Prejudice is also not a factor because the Actions Against Company provision makes Pelnor's compliance with the Notice of Occurrence provision a "condition precedent" to Pelnor having any rights to defense costs from First State. *See supra*, p.12; *Payton*, 188 So. 2d at 651-52.

[8] *See also Gully*, 488 So. 2d at 817-18; *Nucor Steel*, at *4 (applying *Peavey* and *Gully*); *Anco*, at *3 (applying *Peavey* and *Gully*); *Jotun Paints*, at n.26 (applying *Peavey* and *Gully*); *Transcontinental*, 378 F. Supp. 2d at 738-40 (applying *Peavey* and *Gully;* "[the insurer will] be assessed only the cost of litigation incurred by [the insured] subsequent to [the date of notice] . . . [although] there has been no actual prejudice shown by [the insurer]").

[9] Alternatively, any pre-tender defense costs owed would be 24.42% of the total incurred as establish in Section III, *supra*.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The Language of the Umbrella Liability Policy and the Louisiana Supreme Court's *Arceneaux II* decision, or alternatively its *Arceneaux I* decision, which apply the same nearly identical policy language, dictate as a matter of law that First State owed 24.42% of pre-amendment defense costs, which it has already paid for the post-tender/pre-amendment timeframe. Equity and public policy also dictate this result, as expressly set forth by the Louisiana Supreme Court in *Arceneaux II*. And also as a matter of law, defense costs were not owed at all for the pre-tender timeframe because Pelnor failed to comply with its notice duty.

The judgment of the District Court awarding 100% of pre-tender and post-tender/pre-amendment defense costs to Pelnor should therefore be reversed, and judgment should be rendered in favor of appellant First State as a matter of law.

Respectfully submitted,

THE WALTZ LAW GROUP
1100 Poydras Street
Suite 2620 – Energy Centre
New Orleans, Louisiana 70163
Telephone: (504) 264-5260
Facsimile: (504) 264-5487
E-Mail: wilson@waltzlawgroup.com

***s/ Wilson L. Maloz III***
WILSON L. MALOZ, III (LA Bar No. 26396)
ESTELLE C. EISERLOH (LA Bar No. 40353)

**COUNSEL FOR APPELLANT/CROSS-APPELLEE, FIRST STATE INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

I certify that on May 20, 2026, the foregoing Brief of Appellant/Cross-Appellee was filed electronically via the Court's CM/ECF Document Filing System and was served electronically on all counsel for record.

I further certify that on June 17, 2026, in order to make non-substantive revisions, including supplementation of the Certificate of Interested Persons, a revised version of the foregoing Brief of Appellant/Cross-Appellee was filed electronically via the Court's CM/ECF Document Filing System and will be served electronically on all counsel for record.

*s/ Wilson L. Maloz III*
**Attorney of Record for Appellant/Cross-Appellee, First State Insurance Company**

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This brief complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this brief contains 7,894 words.

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED.R.APP.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14 point font, and using 12 point font for footnotes pursuant to Fifth Circuit Rule 32.1.

***s/ Wilson L. Maloz III***
**Attorney of Record for Appellant/Cross-Appellee, First State Insurance Company**

Dated: May 20, 2026