No. 25-30653

# In the United States Court of Appeals For the Fifth Circuit

*PELNOR, LLC, formerly known as Pellerin, Incorporated*
Plaintiff – Appellee/Cross-Appellant

*v.*

*FIRST STATE INSURANCE COMPANY*
Defendant – Appellant/Cross-Appellee

---

On Appeal from the United States District Court
For the Eastern District of Louisiana

---

## Brief of Appellee/Cross-Appellant, *Pelnor, LLC*

---


| | | |
|---|---|---|
| **BIENVENU, FOCO & VIATOR, LLC**<br>David M. Bienvenu, Jr., #20700<br>John Allain Viator, #25915<br>4210 Bluebonnet Blvd.<br>Baton Rouge, LA 70809<br>Phone: (225) 388-5600<br>Fax: (225) 388-5622<br>ATTORNEYS FOR PELNOR, LLC | | **TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.**<br>Barrye Panepinto Miyagi, #21794<br>450 Laurel Street, 8th Floor<br>(70801)<br>P.O. Box 2471<br>Baton Rouge, LA 70821-2471<br>Telephone: (225) 387-3221<br>Facsimile: (225) 346-8049<br><br>ATTORNEYS FOR PELNOR, LLC |

# Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have a financial interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
| --- | --- |
| Pelnor, LLC<br>James Willis Pellerin is the majority member of Pelnor, LLC. The remaining minority members of Pelnor, LLC include various individual members and various trusts members.<br>No publicly held corporation owns 10% or more of the interest of Pelnor, LLC | David M. Bienvenu, Jr. of Bienvenu, Foco & Viator, LLC |
| | John Allain Viator of Bienvenu, Foco & Viator, LLC |
| | Barrye Panepinto Miyagi of Taylor, Porter, Brooks & Phillips L.L.P. |

| Appellant: | Counsel for Appellants: |
| --- | --- |
| First State Insurance Company | Wilson L. Maloz, III of The Waltz Law Group, LLC |

| | |
| --- | --- |
| District Court Judges: | U. S. District Judge<br>Judge Barry W. Ashe<br>Eastern District of Louisiana |
| | U.S Magistrate Judge<br>Eva J. Dossier<br>Eastern District of Louisiana |

**BIENVENU, FOCO & VIATOR , LLC**

By: s/David M. Bienvenu, Jr.
David M. Bienvenu, Jr., #20700
John Allain Viator, #25915
4210 Bluebonnet Blvd.
Baton Rouge, LA 70809
Phone: (225) 388-5600
Fax: (225) 388-5622

and

**TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.**
Barrye Panepinto Miyagi, #21794
450 Laurel Street, 8th Floor
(70801)
P.O. Box 2471
Baton Rouge, LA 70821-2471
Telephone: (225) 387-3221
Facsimile: (225) 346-8049

Counsel for *Pelnor, LLC*

## Statement of Oral Argument

Pelnor, L.L.C. ("**Pelnor**) agrees with First State Insurance Company ("**First State**") that oral argument will likely assist the Court in deciding the issues presented by this appeal and will provide the Court with a meaningful opportunity to challenge the positions of the parties made to this Court. Specifically, oral argument will assist the Court in fully understanding the insidious pervasiveness of how First State continues to misrepresent and misinterpret its own insurance policy language, how First State's arbitrary, capricious and financially punitive behavior against Pelnor continues in this Court and how First State is attempting unilaterally to re-write its own insurance policy under the pretext of "interpretation" to prejudice financially its insured, Pelnor, to which First State owes, as a fiduciary, statutory obligations of good faith and fair dealing under applicable Louisiana law.

## Table of Contents

Certificate of Interested Persons ........................................................ i

Table of Contents ........................................................ iv

Table of Authorities ........................................................ vi

Jurisdictional Statement ........................................................ 1

Statement of Issues ........................................................ 1

Statement of the Case ........................................................ 3

Argument ........................................................ 11

I. THE FIRST STATE POLICY IS AN "ULTIMATE NET LOSS" INDEMNITY UMRELLA POLICY, NOT A PRIMARY LIABILITY INSURANCE POLICY WITH A "DUTY TO DEFEND" TRIGGERED AND DEFINED BY THE ALLEGATIONS OF THE PETITION AND SEPARATE DUTY TO INDEMNIFY. ........................................................ 11

II. FIRST STATE'S REQUIREMENT OF TENDER TO DENY PELNOR'S CLAIM FOR INDEMNIFIED "LEGAL EXPENSES" GROSSLY MISREPRESENTS ITS OWN POLICY LANGUAGE AND IS ARBITRARY AND CAPRICIOUS. ........................................................ 19

III. NEITHER THE FIRST STATE INSURANCE POLICY NOR APPLICABLE LAW PERMIT FIRST STATE TO OFFSET, DIVIDE OR CREDIT ITS INDEMNITY OBLIGATION FOR "LEGAL EXPENSES" INCURRED BY PELNOR IN THIS ACTION AS AN INDEMNIFIED "ULTIMATE NET LOSS" .......... 30

A. First State's denial of Pelnor's claim based on pro-rata allocation arbitrarily and capriciously ignores the language of First State's "ultimate net loss" umbrella liability insurance policy. ........................................................ 31

B. First State's reliance on "duty to defend" cases to deny the payment of Pelnor's claim based on pro-rata allocation is legally erroneous and arbitrary. ........................................................ 36

IV. FIRST STATE WAIVED ITS COVERAGE DEFENSES BY PUTTING ITS INTERESTS AHEAD OF ITS INSURED'S INTERESTS.................................................................45

V. THE DISTRICT COURT'S DENIAL OF PELNOR'S CLAIM FOR STATUTORY PENALTIES UNDER LA. R.S. 22:1892 WAS LEGALLY ERRONEOUS AND AN ABUSE OF DISCRETION. .................................................................51

A. First State has violated La. R.S. 22: 1892 B.(1)(a), ....................53

B. First State violated La. R.S. 22:1892 I.(2)..................................65

Conclusion .........................................................................................71

Certificate of Service .........................................................................73

Certificate of Compliance...................................................................74

# Table of Authorities

## Cases

*Albert v. Cuna Mut. Ins. Soc'y,* 255 So.2d 170 (La. App. 3 Cir.1971) ........ 58

*American Home Assurance Co. v. Czarniecki*, [255 La. 251, 230 So.2d 253 (1969)] ........ 18

*American Safety & Risk Services, Inc. v. Legion Indemnity Company*, 153 F. Supp.2d 869, 878 (E.D. La. 2001) ........ 28

*Arceneaux v. Amstar Corp.*, 15-0588, p. 3 (La. 9/7/16), 200 So. 3d 277, 279 ........ 36, 38, 40, 42, 44

*Carney v. Am. Fire & Indem. Co.,* 371 So.2d 815, 819 (La.1979) ........ 57

*Dufrene v. Gautreau Fam., LLC*, 980 So. 2d 68, 85 (La. App. 5 Cir. 2/22/08) ........ 66

*Elliott v. Continental Casualty Company,* 2006–1505 (La.2/22/07), 949 So.2d 1247 ........ 20

*First Nat. Bank of Louisville v. Lustig,* 975 F.2d 1165, 1167 (5th Cir. 1992) ........ 15

*George S. May Intern. Co. v. Arrowpoint Capital Corp.*, 97 So.3d 1167, 1175, 2011-1865 La. App. 1 Cir. 8/10/12, 11 (La. App. 1 Cir., 2012) ........ 33

*Green v. Johnson*, 241 So.3d 1188, 1192, 2016-1525 La.App. 1 Cir. 1/10/18, 5 (La.App. 1 Cir., 2018) ........ 44

*Gully & Associates v. Wausau Insurance Companies*, 536 So.2d 816 (La. App.1st Cir. 1988) ........ 26

*Haas v. Audubon Indem. Co.*, 722 So.2d 1022, 1029, 98-565 La.App. 3 Cir. 10/21/98, 12 (La. App. 3 Cir., 1998) ........ 65, 66

*Howell v. Am. Cas. Co. of Reading, Pennsylvania*, 691 So.2d 715, 727 (La. App. 4th Cir. 3/19/97) ........ 61

*In Re Volkswagen of America, Inc.* 546 F.3d 304, 309 (5th Cir. 2008) ........ 51

*Kelly v. State Farm Fire & Cas. Co.,* 169 So.3d 328, 341, 2014-1921 La. 5/5/15, 20 (La.,2015) .......... 52, 66

*Kinsale Ins. Co. v. CD Mgmt. of New Orleans, Inc.*, 677 F. Supp. 3d 401, 409 (E.D. La. 2023) .......... 20

*Kinsale Ins. Co. v. Sea Brook Marine*, L.L.C., No. 23-30436, 2024 WL 983653 (5th Cir. Mar. 7, 2024), quoting, La. Civ. Code Ann. Art. 2047 .......... 20

*Kottenbrook v. Shelter Mut. Ins. Co.*, 69 So.3d 561, 563, 46,312 La. App. 2 Cir. 5/18/11, 3 (La. App. 2 Cir., 2011) .......... 45

*Lacoste Aviation, LLC v. StarStone Nat'l Ins. Co.*, 719 F. Supp. 3d 502, 505 (E.D. La. 2024) .......... 59, 66

*Liberty Mut. Ins. Co. v. Jotun Paints, Inc.*, CA 07-3314. *4 (E.D. La. 1/13/2009), 2009 WL 86669 .......... 28

*Louisiana Bag Co., Inc. v. Audubon Indem. Co.*, 999 So.2d 1104, 1117, 2008-0453 La. 12/2/08, 19–20 (La.,2008) .......... 58

*Meloy v. Conoco, Inc.*, 504 So.2d 833, 839 (La.1987) .......... 18, 41

*Moreno v. Entergy Corporation,* 233 So.3d 176, 184, 17-182 La. App. 5 Cir. 11/15/17, 10 (La. App. 5 Cir., 2017) .......... 29

*Nucor Steel Louisiana, LLC v. HDI Global Insurance Co.,* 2022 WL 1773866 (E.D.La., 2022) .......... 27

*Peavey Company v. M/V ANPA*, 971 F.2d 1168, 1178 (5th Cir.1992) .......... 28

*Quinlan v. Liberty Bank and Trust Co.*, 575 So.2d 336, 348 (La.,1990) .......... 15, 17

*Rodgers v. State Farm Mutual Auto. Ins.*, 2015-0868 (La. 6/30/15), 168 So. 3d 375 .......... 21

*Rovira v LaGoDa, Inc.*, 551 So.2d 790, 794-795 (La. App. 5th Cir. 1989) .......... 28

*Sher v. Lafayette Ins. Co.*, 988 So.2d 186, 199, 2007-2441 La. 4/8/08, 14 (La., 2008) .......... 60

*Sultana Corp. v. Jewelers Mut. Ins. Co.*, 860 So.2d 1112, 1118, 2003-0360 La. 12/3/03, 7 (La.,2003) .......... 67

*Terrebonne Concrete, LLC v. CEC Enterprises,* LLC, 2011-0072, 10 (La. App. 1 Cir. 8/17/11), 76 So.3d 502, 509–10 .......... 52

*Transamerica Life Ins. Co. v. Fuselier,* 378 So.3d 145 (La. App. 5 Cir. 11/29/23) .......... 66

*Vesta Ins. Co. v. Amoco Prod. Co.,* 986 F.2d 981, 989 (5th Cir. 1993) .......... 63

**Statutes**

28 U.S.C. § 1332 .......... 1

28 U.S.C. § 1367 .......... 1

29 U.S.C. § 1291 .......... 1

Fed. R. App. Proc. 4 .......... 1

Fed. R. Civ. Proc. 54 .......... 1

La. R.S. 1:3 .......... 66

La. R.S. 22:1892 .......... 53, 60, 61, 66, 69, 71

## Jurisdictional Statement

Complete diversity exists herein and the amount in controversy exceeds $75,000, thus creating subject-matter jurisdiction. 28 U.S.C. § 1332. ROA 25-30653.15206 – ROA 25-30653.15207. Supplemental jurisdiction exists over the crossclaim asserted by Pelnor, L.L.C. ("**Pelnor**") against First State Insurance Company ("**First State**"). 28 U.S.C. § 1367. On October 29, 2025, a Final Judgment as defined by Fed. R. Civ. Proc. 54 was entered by the District Court. ROA 25-30653.15220. On November 25, 2025, Pelnor timely filed a Motion to Alter or Amend the Final Judgment as authorized by Fed. R. Civ. Proc. 59. ROA 25-30653.15237. On December 20, 2025, the District Court entered an Amending Final Judgment. ROA 25-30653.15252. On December 11, 2025, Pelnor timely filed a Notice of Cross Appeal as authorized by Fed. R. App. Proc. 4. ROA 25-30653.15253. This Court's appellate jurisdiction over Pelnor's appeal of right is vested by 28 U.S.C. § 1291.

## Statement of Issues

1. Did the District Court commit legal error in rejecting First State's denial of Pelnor's claim for indemnified "legal expenses" incurred as an "ultimate net loss" on the basis of First State's

unilateral "tender of defense" requirement imposed on Pelnor as contrary to the unambiguous policy language contained in the First State' Umbrella Liability Insurance Policy, which is an indemnity policy under Louisiana law?

2. Did the District Court commit legal error in rejecting First State's denial of Pelnor's claim for indemnified "legal expenses" incurred as an "ultimate net loss" on the basis "pro-rata allocation" asserted by First State that is not applicable to First State' Umbrella Liability Insurance Policy, which is an indemnity policy under Louisiana law?

3. As a matter of Louisiana law, did First State waive its coverage defenses to Pelnor's claim for indemnified "litigation expenses" based on the facts and circumstances of First State's claims decisions following Pelnor's agreement to indemnify Pelnor for 100% of Pelnor's "settlement costs", as an indemnified "ultimate net loss"?

4. Did the District Court abuse its discretion and/or commit legal error in denying Pelnor's claim for statutory penalties against First State under La. R.S. 22:1891 by misapplying controlling

Louisiana law to the facts and circumstances found in the record and the burden and standard of proof applicable to a claim for statutory penalties under Louisiana law?

## Statement of the Case

The salient facts relevant to these appeals governed by Louisiana insurance law are relatively finite and undisputed:

1. First State Insurance Company issued an "Umbrella Liability Insurance Policy" to Pellerin Milnor Corporation, as a named insured, under Policy Number 901090, with a policy period of May 31, 1973, to May 31, 1976 ("**the First State policy**").[1] The First State policy requires First State to indemnify Pelnor for "ultimate net loss" as defined by the policy language. ROA 25-30653.15355- ROA 25-30653.15370; ROA 25-30653.15179.[2]
2. In Plaintiffs' Third and Superseding Complaint, filed on March 25, 2024, Robert Sentilles ("**Mr. Sentilles**") alleged he was employed by Pelnor as a welder on its premises when he

[1] The parties stipulated that Pelnor holds the rights of Pellerin Milnor Corporation under the First State Policy. ROA 25-30653.15179.

[2] The First State policy is also contained in Pelnor's records excerpts as RE1.

allegedly was exposed to dust from personally handling and near others handling asbestos-containing products between the years 1974 and 1976. The Amending Complaint further alleged that Mr. Sentilles was diagnosed with malignant mesothelioma on October 27, 2020, and that Pelnor caused or contributed to Plaintiff suffering bodily injury damages. Mr. Sentilles asserted claims against Pelnor for bodily injury based on theories of negligence and strict liability under Louisiana law. ROA 25-30653.15401 - ROA 25-30653.15422.

3. On September 5, 2024, Mr. Sentilles reached a settlement with Pelnor and First State, as insurer of Pelnor, for all claims asserted by Robert Sentilles against Pelnor and First State[3] amount of REDACTED.[4] ROA 25-30653.15180. Prior to settlement, First State associated with Pelnor in the defense and control of the claim and proceeding. ROA 25-30653.15180.

---

[3] First State was also sued directly by Robert Sentilles in the Third Amending, Supplemental and Amending Complaint prior to settlement with Robert Sentilles in its own capacity and as insurer of Pelnor. ROA 25-30653.15401 - ROA 25-30653.15422.

[4] While the specific amount is confidential by agreement between Mr. Sentilles, Pelnor and First State, the settlement amount was much higher than the amount sought to recovered as indemnified "legal expenses" in Pelnor's crossclaim filed against First State.

Pelnor and First State cooperated fully to negotiate a settlement of Mr. Sentilles's claims against them for an amount authorized and entirely funded by First State alone, without any contribution from Pelnor or any other insurer. ROA 25-30653.15180.

4. The limit of First State's policy is $5,000,000 in excess of Pelnor's $10,000 Retained Limit for "Ultimate net loss as the result of any one occurrence not covered by said underlying insurance". ROA 25-30653.15355. Pelnor submitted no evidence in the District Court showing that Pelnor had any "other collective insurance" providing coverage for the "ultimate net loss" created when Pelnor settled Plaintiff's claims with the authority, cooperation and consent of First State. Nor did First State dispute that Pelnor had no underlying insurance for the occurrence that resulted in the settlement and "litigation expenses" loss indemnified by First State.

5. First State received notice of its potential indemnification for Pelnor's indemnified "ultimate net loss" on March 22, 2022, well before its insurance indemnification obligation for an "ultimate

net loss" was triggered when Pelnor settled with Robert Sentilles on September 5, 2024. ROA 25-30653.15179

6. In the District Court, First State did not allege inadequate or insufficient notice on the part of Pelnor as a basis to deny coverage for Pelnor's claims. ROA 25-30653.15165 – ROA 25-30653.15166; ROA 25-30653.15210,

7. In addition to the "settlement" "ultimate net loss", Pelnor sustained and paid "loss expenses and legal expenses" in defending the settled claim in the amount of $348,000 reasonably incurred for Pelnor's legal representation and defense of Mr. Sentilles' multi-million claim. The pre-tender "legal expenses" submitted by Pelnor to First State pursuant to the Policy that are unpaid and disputed by First State are in the amount of $236,000. The post-tender and pre-amendment "legal expenses" submitted by Pelnor to First State pursuant to the Policy that are unpaid and disputed by First State amount to $112,000. ROA 25-30653.15182 - ROA 25-30653.15183.

8. Pelnor made a claim litigated in the District Court against First State for these "loss expenses and legal expenses". ROA 25-

30653.15210. First State stipulated that the "loss expenses and legal expenses" incurred and paid by Pelnor to protect Pelnor from "ultimate net loss" in the amount of $348,000 were reasonable and necessary in Pelnor's defense, legal representation and risk management of Pelnor's potential liability arising from the claims asserted by Robert Sentilles against Pelnor in this civil action. ROA 25-30653.15183.

9. First State never alleged or proved that Pelnor's "loss expenses and legal expenses" were covered by any other insurance issued to Pelnor.

10. In response to Pelnor's claim "loss expenses and legal expenses", First State flatly denied any obligation or claim to pay Legal Expenses incurred prior to receiving notice of the claim on March 16, 2022. First State also denied any obligation to pay 24.42% of Pelnor's reasonable and necessary "litigation expenses" between tender of notice on March 16, 2022 and the filing of Plaintiff's Third Amended, Restated, and Superseding Complaint on March 25, 2024, based on the allegations contained in the original

Complaint, which are irrelevant as a matter of law. ROA 25-30653.15181; ROA 25-30653.15211 – ROA 25-30653.15212.

11. By way of cross-motions for summary judgment filed in the District Court, Pelnor and First State both sought determination of the extent of First State's obligation to pay Pelnor's pre-tender (before March 16, 2022), and post-tender, but pre-amendment (between March 16, 2022 and March 25, 2024) legal expenses.[5]

12. On January 18, 2025, the District Court granted Pelnor's motion for partial summary judgment and denied First State's motion for summary judgment and ruled "First State is liable for all of Pelnor's attorney's fees and costs incurred in defending against Sentilles' claim and Avondale's cross-claim without division, reduction, or off-set because the insurance provides for the indemnification of Pelnor's ultimate net loss, which includes such fees and costs, and the policy contains no duty to defend." ROA 25-30653.13953 – ROA 25-30653.13968.[6]

---

[5] ROA 25-30653.15211; ROA. 25-30653.13822 – ROA 25-30653.13923; ROA 25-30653.13793; ROA 25-30653.13923 – ROA 25-30653.15693.

[6] The District Court's summary judgment ruling and cases cited by the District Court in the summary judgment ruling, by stipulation, were exhibits offered, filed and introduced in evidence at the statutory penalties trial conducted on September 18,

13. First State had satisfactory and documented "proof of loss" arising from Pelnor's unpaid "loss expenses and legal expenses" submitted by Pelnor to First State no later than January 20, 2025. ROA 25-30653.15183.

14. Since January 20, 2025, First State has not paid or tendered to Pelnor any of the disputed legal expenses that were the subject of the District Court's summary judgment ruling entered on January 20, 2025. ROA 25-30653.15183.

15. First State submitted no evidence in the District Court proving or even suggesting any prejudice sustained from the notice provided by Pelnor to First State or the timing of the notice regarding claims made by Robert Sentilles against Pelnor.

## Summary of Argument

The First State Umbrella Liability Insurance Policy[7] insured Pelnor for an "ultimate net loss" triggered by a loss through settlement that included "legal and litigation expenses". Under First State's policy language, the "ultimate net loss" to be indemnified by First State is

2025. ROA 25-30653.15694 – ROA 25-30653.15798. The ruling also contained in Pelnor's records excerpts as RE2.

[7] ROA 25-30653.15355 – ROA 25-30653.15370.

determined at the time of either a judgment against the insured or a settlement involving the insured. In this case, the "ultimate net loss" sustained by Pelnor and indemnified by First States was the "settlement" and "legal expenses" reached with Robert Sentilles by Pelnor and First State on September 5, 2024, from on an "occurrence" within Pelnor's policy period defined at the time of settlement.

First State agrees owing and has paid 100% indemnity for Pelnor's settlement costs as a covered "ultimate net loss", thus admitting that First State was the only insurer "on the risk" that was settled at the time of settlement when Pelnor's indemnification right was triggered and vested. First State paid 100% of Pelnor's settlement directly to Robert Sentiles.

Under the First State Policy, as correctly decided and interpreted by the District Court, First States is liable "without division, reduction or set-off", to indemnify completely Pelnor for any amounts paid or payable by Pelnor in settlement of the claims asserted by Plaintiff against Pelnor in this action and "all loss expenses and legal expenses (including attorneys' fees, courts costs and interests on any judgment or award)" that constitute an indemnified "ultimate net loss". First State

has impermissibly applied set offs, inconsistent with unambiguous policy language to deny Pelnor's claim for indemnified "legal expenses" in the amount of $348,000.

Moreover, under applicable Louisiana law, First State is liable to Pelnor for statutory penalties under La. R.S. 22:1892 because is failure to pay Pelnor's "legal and litigation expenses" is arbitrary, capricious and without probably cause, in addition to being a misrepresentation of policy conditions contained in the First State policy.

## Argument

### I. THE FIRST STATE POLICY IS AN "ULTIMATE NET LOSS" INDEMNITY UMRELLA POLICY, NOT A PRIMARY LIABILITY INSURANCE POLICY WITH A "DUTY TO DEFEND" TRIGGERED AND DEFINED BY THE ALLEGATIONS OF THE PETITION AND SEPARATE DUTY TO INDEMNIFY.

An insurance policy is a contract between the insured and the insurer and has the effect of law between the parties. Because an insurance policy is a contract, the rules established for the construction of written instruments apply to contracts of insurance. The parties' intent, as reflected by the words of an insurance policy, determines the extent of coverage, and the intent is to be determined in accordance with

the plain, ordinary, and popular sense of the language used in the policy, unless the words have acquired a technical meaning.[8]

As the law between the parties, the relevant provisions of the First State Policy[9] read:

> Coverage
>
> The Company agrees to indemnify the insured for ultimate net loss in excess of the retained limit hereinafter stated, subject to the limitations, conditions and other terms of this policy, which the insured may sustain by reason of the liability imposed upon the insured by law, or assumed by the Insured under contract on account of:
>
> (a) Personal Injury Liability
>
> For damages and expenses including damages for care and loss of services, to which this insurance applies, because of personal injury, including death resulting therefrom, which occurs during the policy period, sustained by any person or persons, caused by an occurrence;

The Definition of "Ultimate Net Loss" in the Policy is:

> Ultimate Net Loss
>
> "Ultimate Net Loss" means the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the Insured is liable either by adjudication or compromise with the written consent of the Company, including after making proper deduction for all recoveries and salvages collectible, all loss expenses and legal expenses (including attorneys' fees, court costs and interests on any judgment or award) but excludes all salaries of employees and office expenses of the insured, the Company or any underlying insurer so insured.

Endorsement #3[10] contained in the First State policy amends,

[8] *Hudson v. Jager Bomb LLC.*, 47,501, (La. App. 2 Cir. 11/14/12), 107 So.3d 712, 715.

[9] ROA25-30653.15355- ROA.25-30653.15370.

[10] ROA.25-30653.15364-ROA25-30653.15365.

supersedes, and nullifies the definition of "occurrence" contained in the policy form and replaces that definition of "occurrence" with the following definition that includes no reference to or limitation of the occurrence being limited only to the policy period:

> 8. Occurrence
>
> With respect to Coverages 1 (a) and 1 (b) "occurrence" shall mean an accident or event including continuous or repeated exposure to conditions which results in personal injury or property damage neither expected nor intended from the standpoint of the Insured. For the purpose of determining the limit of the Company's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
>
> With respect to Coverage 1 (c), all damages involving the same injurious material or act, regardless of the frequency of repetition thereof, the number or kind of media used, and the number of claimants shall be deemed to arise out of one "occurrence."

Under First State's policy language, the "ultimate net loss" to be indemnified by First State is determined at the time of either a judgment against the insured or a settlement involving the insured. In this case, the "ultimate net loss" sustained by Pelnor and indemnified by First States was the "settlement" and "legal expenses" reached with Robert Sentilles by Pelnor and First State on September 5, 2024, from on an "occurrence" within Pelnor's policy period defined at the time of settlement. This occurrence is defined by the Third Amending, Supplemental and Superseding Complaint filed by Robert Sentilles in

April of 2024.[11] First State agrees owing 100% indemnity for Pelnor's settlement costs as a covered "ultimate net loss", thus admitting that First State was the only insurer "on the risk" that was settled at the time of settlement when Pelnor's indemnification right was triggered and vested. First State paid 100% of Pelnor's settlement directly to Robert Sentiles. However, First State arbitrarily and capriciously has denied a substantial portion of Pelnor's claim for indemnified "legal expenses" for spurious reasons.

Under the First State Policy, as correctly decided and interpreted by the District Court,[12] First States is liable "without division, reduction or set-off", to indemnify completely Pelnor for any amounts paid or payable by Pelnor in settlement of the claims asserted by Plaintiff against Pelnor in this action and "all loss expenses and legal expenses (including attorneys' fees, courts costs and interests on any judgment or award)" that constitute an indemnified "ultimate net loss".

[11] ROA.25-30653.15401- ROA.25-30653.15422.

[12] ROA.25-30653.13953- ROA.25-30653.13968.

Louisiana law recognizes two different types of insurance policies: liability policies and indemnity policies.[13] Under a general primary liability policy, the insurer is required to defend an insured based on "the duty to defend" contained in standard policy language although the insured has not yet suffered any loss because the purpose of the primary liability policy is to shield the insured from being required to make any payment on the claim from the outset of when the claim is asserted against the insured. When implementing the requirements of primary liability insurance, the insurance company owes a direct duty to defend the insured, separate and distinct from any duty to indemnify the insured for actual liability and hires an attorney to represent the insured. The insurance hired attorney defends the insured until a settlement or an adjudication of the insured's liability for the occurrence described in the underlying action. Because the insured is directly defended by the insurer and the defense obligation is contractually transferred from the insured to the insurer when potentially covered claims are asserted in a petition, the insured typically tenders the case to the insurer for a defense

[13] See, *Quinlan v. Liberty Bank and Trust Co.*, 575 So.2d 336, 348 (La.,1990); *First Nat. Bank of Louisville v. Lustig,* 975 F.2d 1165, 1167 (5th Cir. 1992)

when the defense obligation is triggered by the filing of a pleading articulating a claim covered by the insurance policy.

Another form of insurance, distinct and different from a general liability insurance policy, is an "ultimate net loss" umbrella liability policy issued here from First State to Pelnor, with an indemnification provision. This form of umbrella insurance is assumed to be a financial safety net that pays, through a written indemnification obligation, the total financial obligation or "ultimate net loss" sustained by the insured for a covered risk, after primary insurance is exhausted, including the costs of settlement, the cost of a liability judgment and legal defense costs not paid by primary or other insurance. The insurance coverage is triggered only after and if a settlement cost is incurred or a liability judgment is entered against the insured. The Umbrella Liability insurer does not defend the insured under a duty to defend, based on the allegations of the Complaint. The insurer indemnifies the insured for unpaid litigation expenses and fees related to a settlement after primary and other insurance are applied. If the insured does not settle the claim and obtains a summary judgment dismissing all liability claims, the

umbrella liability insurer owes nothing to the insured that has not sustained a loss as defined by the policy language.

Under First State's indemnity policy, Louisiana law establishes that the insurer is only required to indemnify or make whole the insured after the insured has sustained actual loss, meaning after the insured has paid or been compelled to make a payment, his action against the insurer then being to recover the amount of such loss by way of indemnity.[14] The general distinction between the two kinds of insurance is that if the policy is one against liability, the coverage thereunder attaches when the liability attaches, regardless of actual loss at that time; but if the policy is one of indemnity only, an action against the insurer does not lie until an actual loss in the discharge of the liability is sustained by the insured.[15] Moreover, an indemnity policy does not create an independent "duty to defend" on the part of the insurer for the insured, as is the case with a primary general liability insurance policy, but rather creates an indemnification obligation requiring the insurer to reimburse the insured for "legal expenses" incurred by the insured and

[14] *Quinlan v. Liberty Bank and Trust Co.*, 575 So.2d 336, 348 (La.,1990)
[15] Id. at 349.

unpaid by available primary insurance only after the insured sustains a covered loss by way of settlement or judgment.

Stated most simply, primary liability insurance is triggered at the outset of litigation through a specific "duty to defend" unique to primary liability insurance. "Ultimate net loss" indemnity insurance is triggered at the end of litigation (i.e. the word "ultimate") through policy language unique this type of insurance. Conflating the two types of insurance, as First State is doing on this appeal, runs the analytical train of the tracks.

This legal distinction between liability insurance and indemnity insurance is well established and was articulated by the Louisiana Supreme Court in *Meloy v. Conoco, Inc.*, 504 So.2d 833, 839 (La.1987), where the court explained:

> An indemnity agreement is a specialized form of contract which is distinguishable from a liability insurance policy. A cause of action under a liability insurance policy accrues when the liability attaches. Appelman, Insurance Law and Practice (Buckley ed.) Sec. 4261. However, an insurer's duty to defend arises whenever the pleadings against the insured disclose a possibility of liability under the policy. *American Home Assurance Co. v. Czarniecki*, [255 La. 251, 230 So.2d 253 (1969)]; Appelman, Insurance Law and Practice (Berdal ed.) Sec. 4683.01. On the other hand, an indemnity agreement does not render the indemnitor liable until the indemnitee actually makes payment or sustains loss. BLACK'S LAW DICTIONARY 692–93 *412 (5th ed. 1979); Appelman, Insurance Law and Practice (Buckley ed.) Secs.

> **5 4261, 6668. **Therefore, a cause of action for indemnification for cost of defense does not arise until the lawsuit is concluded and defense costs are paid [footnote omitted]. (Bold added).**

The policy language unambiguously establishes that the First State policy is an indemnity insurance policy, not a liability insurance policy, because no action against First State is created by a mere allegation of liability against Pelnor. The insured's rights against the insurer is triggered only when the insured sustains an actual loss, not just an allegation of potential liability, as is the case with primary general liability insurance:

> E. Action Against Company: No action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.

Thus, the language of the First State policy and applicable Louisiana law define the legal interpretation of First State's policy issued to Pelnor.

## II. FIRST STATE'S REQUIREMENT OF TENDER TO DENY PELNOR'S CLAIM FOR INDEMNIFIED "LEGAL EXPENSES" GROSSLY MISREPRESENTS ITS OWN POLICY LANGUAGE AND IS ARBITRARY AND CAPRICIOUS.

The insurance law that must be followed by the Court, First State and Pelnor is well established. What guides a court also guides First

State in its claims handling based on policy interpretation. "An insurance policy 'should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion.'"[16] If the language in an insurance contract is clear and unambiguous, the agreement must be enforced as written and a reasonable interpretation consistent with the obvious meaning and intent of the policy must be given. However, if after applying the other rules of construction an ambiguity remains, the ambiguous provision is to be construed against the drafter and in favor of the insured.[17]

Notwithstanding the absence of any prejudice sustained by First State from the date when Pelnor notified First State of this claim in March of 2022, First State contended in the District Court that no "legal expenses" are reimbursable to Pelnor prior to March of 2022 and that Pelnor was required to tender this action to First State for a defense. On

---

[16] *Kinsale Ins. Co. v. CD Mgmt. of New Orleans, Inc.*, 677 F. Supp. 3d 401, 409 (E.D. La. 2023), aff'd sub nom. *Kinsale Ins. Co. v. Sea Brook Marine*, L.L.C., No. 23-30436, 2024 WL 983653 (5th Cir. Mar. 7, 2024), quoting, La. Civ. Code Ann. Art. 2047.

[17] *Elliott v. Continental Casualty Company,* 2006–1505 (La.2/22/07), 949 So.2d 1247.

this issue, First State bears the burden of proving the applicability of an exclusionary clause within a policy.[18]

In the District Court, First State agreed it was fully notified and appraised of the claim when the case was settled by Pelnor and First Sate on September 4, 2024. In the District Court, First State in numerous filings stipulated that "First State did not, at any time, deny coverage or refuse to participate in the defense of the instant lawsuit on the grounds that Pelnor's notice was late." ROA 25-30653.15165 – ROA 25-30653.15166

Now First State, in this Court, is arbitrarily arguing the exact opposite and cites for the first time a Policy Provision entitled "Notice of Occurrence" to disclaim coverage because "Pelnor did not timely comply with the Notice of Occurrence provision."[19] Notably, First State does not cite, analyze or argue the policy language contained in the "Notice of Occurrence" provision[20] to explain how notice was not satisfied here under the specific provision or where this issue was preserved in the District Court. Nor does First State cite or explain how the policy

---

[18] *Rodgers v. State Farm Mutual Auto. Ins.*, 2015-0868 (La. 6/30/15), 168 So. 3d 375.

[19] First State Original Brief as Appellant, p. 29.

[20] ROA 25-30653.15370.

language creates the penalty it seeks to impose on Pelnor in denying payment for any indemnified "legal expenses" incurred prior to March 16, 2022, in the amount of $236,000.

First State's new citation of the "Notice of Occurrence" condition is the definition of being arbitrary or capricious and just plain making it up as you go along to penalize Pelnor financially. First State did not cite the Notice of Occurrence provision as an affirmative defense in its answer to Pelnor's cross-claim. ROA 25-30653.15829 – ROA 25-30653.15847. First State never argued or raised the "Notice of Occurrence" provision in the District Court to deny Pelnor's claim for indemnified "litigation expenses". This "Notice of Occurrence" provision was not referenced in First State's summary judgment filings or at the trial of the statutory bad faith claims. ROA 25-30653.15423 – ROA 25-30653.15483, First State did not cite the "Notice of Occurrence" condition in its Proposed Findings of Fact (ROA 25-30653.15165 – ROA 25-30653.15169), Proposed Conclusions of Law (ROA 25-30653.15170 – ROA 25-30653.15176) or Post Trial Memorandum (ROA 25-30653.15198 – ROA 25-30653.15205) filed in the District Court.

What First State asserted in the District Court to deny Pelnor's claim for pre-tender "legal expenses" was First State's unilateral unwritten requirement that Pelnor was required to tender the case to First State for a defense based the "Assistance and Cooperation" policy condition cited in First State's answer to Pelnor's crossclaim. ROA.25-30653.15836 First State notably does not cite this policy condition to this Court because when reviewed, this provision prohibited Pelnor from tendering the Sentilles case to First State for defense prior to settlement (ROA 25-30653.15370):

> F. Assistance and Co-operation: Except as provided in Insuring Agreement II (Retained Limit—Limit of Liability) with respect to the exhaustion of the aggregate limit(s) of the underlying policy(ies) listed in Schedule A, or in Condition I. (Underlying Insurance), the Company shall not be called upon to assume charge of the settlement or defense of any claim made or proceedings instituted against the Insured; but the Company shall have the right and opportunity to associate with the Insured in the defense and control of any claim or proceedings reasonably likely to involve the Company. In such event the Insured and the Company shall cooperate fully.

Without legal basis or even basic shame, in this Court, First State is continuing to manufacture and impose unwritten arbitrary and capricious requirements on Pelnor, under the guise of insurance interpretation, to financially penalize Pelnor for not tendering the case to First State when the Policy itself unambiguously states that "the Company shall not be called up to assume … defense of any claim made

or proceedings instituted against the insured." In this Court, First State is purposefully trying to obfuscate different conditions ("Notice of Occurrence" and "Cooperation and Assistance") contained in the First State policy to defend, on a new basis, what was wholly indefensible in the District Court. First State's litigation conduct is gross mistreatment of an insured and an insult to both the District Court and this Court.

Judge Ashe knew what First State was arguing in the District Court (different than what is being argued in this Court) and Judge Ashe correctly found that First State's requirement of tender and the financial penalty imposed by First State on Pelnor for not tendering is contrary to First State's own unambiguous policy language:

> **Because the First State policy does not include a duty to defend, Pelnor had no duty to tender the defense to First State. The insurance policy does require notice though. And Pelnor complied by giving First State Notice, but such notice did not constitute a "tender" because it was not required for purposes of triggering any duty to defend on First State's part. That First State decided of its own accord – a choice, not a duty – to pay some of Pelnor's defense costs as they were incurred post-notice does not write a duty to defend into an insurance policy that clearly and unambiguously contains none.**[21]

---

[21] ROA 25-30653.15707.

First State's arbitrary and capricious "tender" requirement imposed on Pelnor inexplicably ignores the word "ultimate" as used in the indemnified "ultimate net loss" Policy language. The definition of the word "ultimate" refers to an event "happening at the end of a process" or "arrived at as the last result".[22] Pelnor's claim against First State for "legal expenses" as "an ultimate net loss" was not activated until after the "ultimate net loss" occurred on September 5, 2024, through a "settlement payable", at the end of the legal process applicable to Pelnor, that was paid by First State. The First State Policy here created no obligation on the part of First State to defend Pelnor when this suit was filed prior to a covered "ultimate net loss" being incurred by Pelnor. Consequently, any tender potentially made by Pelnor to defend prior to Pelnor's settlement with Plaintiff is irrelevant because First State's insurance was not triggered until Pelnor's settlement loss and "legal expenses" were actually incurred.

The cases by First State do not apply to an Umbrella Liability Policy where the insurer is obligated to indemnify an insured for "legal

[22] https://www.britannica.com/dictionary/ultimate
https://www.merriam-webster.com/dictionary/ultimate

expenses" only after an "ultimate net loss" is incurred in the final stage of litigation. First State cites the decision in *Gully & Associates v. Wausau Insurance Companies,*[23] in support of its position that pre-tender defense costs are not owed to Pelnor. In *Gully*, the insurance policy was a primary general liability insurance policy and the underlying claim was dismissed on exceptions under Louisiana law. The insured in *Gully* transferred no liability to the insurer via indemnity because the insured had no liability and sustained no "ultimate net loss". The insurer had both a duty and right to defend the insured in *Gully* and the "duty to defend" sought to be enforced by the insured against the insurer was claimed only after the underlying litigation was completed and the suit was dismissed.[24] The legal analysis in *Gully* is plainly not applicable to an "ultimate net loss" indemnity policy. Moreover, the pre-tender defense costs of the insured provided absolutely no value to the insurer in *Gully*, which distinguishes the result in *Gully* from the economic circumstances between Pelnor and First State. Moreover, Pelnor was prohibited by the First State indemnity policy from demanding a defense

---

[23] *Gully & Associates v. Wausau Insurance Companies*, 536 So.2d 816 (La. App.1st Cir. 1988).

[24] 536 So.2d at 817-818.

from First State, which again clearly distinguishes the holding of *Gully* from the issues presented here. First State's citation of *Gully* is metaphorically trying to apply rules applicable only to apples to something that is not even fruit.

First State's citation of Judge Africk's unpublished decision in the *Nucor Steel*[25] case as somehow supporting denial of Pelnor's claim for "legal expenses" can only be charitably described as baffling. Judge Africk's ruling was clearly decided in the context of a liability insurance policy where a "duty to defend" was allegedly owed to an insured who then assigned its insurance claim against the insurer to a third party.[26] Judge Africk specifically distinguished the tender requirement applicable to liability insurance to indemnitors such as First State in the indemnity policy – "Whereas an insurer's duty to defend does not arise until the insurer receives notice or tender, the same principle does not apply to indemnitors…" Thus, the legal distinctions made by Judge Africk between an indemnity policy and the "duty to defend" contained

---

[25] *Nucor Steel Louisiana, LLC v. HDI Global Insurance Co.,* 2022 WL 1773866 (E.D.La., 2022)

[26] Nucor Steel Louisiana, LLC v. HDI Global Insurance Co., 2022 WL 1773866, at *2 (E.D .La. 2022)

in a primary liability policy show the lack of merit in First State's denial of Pelnor's claim for "legal expenses" indemnity. Again, based on the policy language applicable here, Pelnor had no right to demand a defense from First State and had nothing to tender in the context of a duty to defend.

Moreover, even in the context of the "duty to defend", assuming hypothetically the issue was applicable, the weight of persuasive and correctly reasoned legal authority holds that an insurer's duty to defend compasses the insured's costs for their defense prior to the receiving notice of a lawsuit, absent evidence that the insurer **was actually prejudiced** by the insured's late notice or tender.[27] In *Peavey*, this Court, on the recoverability of pre-notice or pre-tender defense costs, held that "Zurich has not been prejudiced by Degesch's late notice. What is even more decisive is the fact that Zurich cannot argue that it did not benefit from Degesch's investigative efforts prior to notification. In fact, Zurich

[27] *Peavey Company v. M/V ANPA*, 971 F.2d 1168, 1178 (5th Cir.1992); *American Safety & Risk Services, Inc. v. Legion Indemnity Company*, 153 F. Supp.2d 869, 878 (E.D. La. 2001*); Liberty Mut. Ins. Co. v. Jotun Paints, Inc.*, CA 07-3314. *4 (E.D. La. 1/13/2009), 2009 WL 86669; *Rovira v LaGoDa, Inc.*, 551 So.2d 790, 794-795 (La. App. 5th Cir. 1989).

relied entirely on Degesch's investigations. Therefore, we find that Degesch's attorney fees prior to notice are recoverable."[28]

Here, First State benefitted from Pelnor's defense of the claim going back to commencement of the action and prior to tender and notice. Given the complete contractual transfer of risk from Pelnor to First State in the First State policy for settlement reached with Robert Sentilles, that was paid entirely by First State, First State was the only party, in the end, who benefitted from the defense. Pelnor had no liability that was not indemnified by First State. Here, Pelnor is the only party prejudiced if forced to bear the cost of pre-tender defense costs that ended up being valuable only to First State, which indemnified Pelnor. First State's legal position requiring "tender" not only ignores its own policy language. The financial penalty imposed by First State also is entirely offensive to the equities and requires Pelnor to absorb expenses for the settlement benefit that was received exclusively by First State.

As an insurer is charged with knowledge of the contents of its own policy.[29] A misrepresentation of policy language or policy conditions is

[28] *Id.* at 1178.

[29] *Moreno v. Entergy Corporation,* 233 So.3d 176, 184, 17-182 La. App. 5 Cir. 11/15/17, 10 (La. App. 5 Cir., 2017)

never an acceptable standard of care for an insurer. First State's denial of Pelnor's claim for indemnified legal expenses by unilaterally imposing and fabricating a "tender" requirement on Pelnor for this indemnity policy is nothing short of a bad faith denial of Pelnor's claim by First State that misrepresents to both Pelnor and the Court the benefits, advantages, conditions and terms of the insurance indemnity policy that was purchased by Pelnor and delivered by First State to Pelnor.

## III. NEITHER THE FIRST STATE INSURANCE POLICY NOR APPLICABLE LAW PERMIT FIRST STATE TO OFFSET, DIVIDE OR CREDIT ITS INDEMNITY OBLIGATION FOR "LEGAL EXPENSES" INCURRED BY PELNOR IN THIS ACTION AS AN INDEMNIFIED "ULTIMATE NET LOSS".

First State contends that the "legal expense" indemnification obligation applicable here is divisible, prior to the filing of Plaintiff's Third Supplemental, Restated and Amending Complaint, and First State only owes a pro-rata share of legal expenses based on the alleged duration of Plaintiff's alleged occupational exposures to asbestos beyond the First State Policy period of May 31, 1973 to May 31, 1976, made in the original Complaint.

Judge Ashe correctly rejected First State's position on this issue and cogently reasoned:

> Instead, First State's liability for Pelnor's legal expenses arises from its obligation to indemnify Pelnor for its "ultimate net loss," which by definition and stipulation, includes those expenses Pelnor incurred in defending against Sentilles's claim and Avondale's crossclaim. Given the policy language in play here, there is no rationale for limiting First State's obligation for the payment of Pelnor's defense costs to those incurred in the post-tender/pre-amendment period based on First State's time-on-the-risk.
>
> In sum, First State is liable for all of Pelnor's attorney's fees and costs incurred in defending against Sentilles's claim and Avondale's crossclaim without division, reduction, or set-off because the insurance policy provides for the indemnification of Pelnor's ultimate net loss, which includes such fees and costs, and the policy contains no duty to defend.[30]

Judge Ashe's summary judgment ruling is not legally erroneous.

A. **First State's denial of Pelnor's claim based on pro-rata allocation arbitrarily and capriciously ignores the language of First State's "ultimate net loss" umbrella liability insurance policy.**

First State's disclaimer of coverage on this issue ignores the policy language expressly set forth in this "ultimate net loss" umbrella liability insurance policy and tries to re-write the policy as a primary liability insurance policy with a "duty to defend". First State also arbitrarily and capriciously is denying Pelnor's claim for indemnified "legal expenses" based on "pro-rata allocation" based on a body of law applicable only to a

[30] ROA.25-30653.151708

"duty to defend" contained in a primary liability insurance policy that is wholly inapplicable to the First State "ultimate net loss" umbrella policy triggered here to protect Pelnor.

Under the insuring agreement between First State and Pelnor, and the terms and conditions of First State's Umbrella Liability Insurance Policy issued to Pelnor, First States is obligated, without division or set-off, to indemnify completely Pelnor for any amounts paid or payable by Pelnor and "**all loss expenses and legal expenses** (including attorneys' fees, courts costs and interests on any judgment or award)". The indemnification language in First State's policy does not include or provide for any "division" or "offset" for this component of indemnified "ultimate net loss". The policy language that requires First State to indemnify and reimburse Pelnor for all "legal expenses" incurred in defense of this action, without division, offset or reduction, is clear and unambiguous. The indemnity for settlement costs and "legal expenses" in this case arise from a single contractual indemnification obligation contained in the First State policy, not separate and distinct obligations as is the case with a duty to defend and a duty to indemnity contained in a liability insurance policy.

Again, if First State claims a right of division, reduction or offset for its indemnity obligation owed to Pelnor, First State has the burden of proving these rights as the insurer.[31] First State agrees that it owes that it owes 100% indemnity for Pelnor's settlement costs as an "ultimate net loss", thus admitting that First State was the only insurer on the risk that was settled at the time of settlement when Pelnor's indemnification right was triggered and vested. The "legal expenses" incurred as part of the "ultimate net loss) were incurred and entirely related to the settled risk because after the case settled, nothing was left to defend. First State has submitted absolutely no evidence whatsoever showing that Pelnor had any other insurance covering the "ultimate net loss" defined in the Policy.

In its Brief, First State once again does not even cite to this Court the policy language that governs the circumstances when an offset or credit can be claimed. The governing policy language reads[32]:

[31] *George S. May Intern. Co. v. Arrowpoint Capital Corp.*, 97 So.3d 1167, 1175, 2011-1865 La. App. 1 Cir. 8/10/12, 11 (La. App. 1 Cir., 2012)

[32] ROA.25-30653.15370

> **H. Other Insurance:** If other collectible insurance with any other insurer is available to the Insured covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder), the insurance hereunder shall be in excess of, and not contribute with, such other insurance. If collectible insurance under any other policy(ies), of the Company is available to the Insured, covering a loss also covered hereunder (other than underlying insurance of which the insurance afforded by this policy is in excess), the Company's total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy(ies).

First State makes no argument here and provided no evidence in the District Court that Pelnor had any "other collective insurance" providing coverage for the "ultimate net loss" including "legal expenses" created when Pelnor settled Plaintiff's claims with the authority, cooperation and consent of First State. First State concedes that there was no other insurance available for the settlement cost component of the "ultimate net loss" sustained by Pelnor.

**First State did not provide Pelnor with "duty to defend" insurance. First State's counsel expressly admitted this fact during the trial of this matter when questioned by Judge Ashe.**[33]

[33] ROA.25-30653.15319.

**MR. MALOZ:** Okay. And that being said, Your Honor, a large portion of my argument and position is based on the statements in the order and reasons that rejected the assertion that -- our assertion that there was a duty to defend, which we actually didn't make. So I will briefly touch upon what I was going to touch upon, sort of putting that aside.

The response of Pelnor's counsel in closing argument was the following:[34]

They ask the Court in proposed conclusions of law No. 2 to say that First State did not ever assert that there was a duty to defend or base its legal arguments on there being a duty to defend, and that First State has always acknowledged that any obligation for defense for cost under the policy is by way of indemnity.

Your Honor was absolutely right. If what they're saying now is this is not duty to defend, then what they're telling the Court is these cases that we have cited that regulate specifically a duty to defend have no basis here and can never and should never have been used to support their denial of coverage.

First State cannot assert straw man coverage defenses applicable only to a different and distinct form of insurance coverage and avoid

[34] ROA 25-30653.15341

payment of Pelnor's legitimate and proven claim for "legal expenses" as a component of owed indemnity set forth unambiguously in the First State policy.

B. First State's reliance on "duty to defend" cases to deny the payment of Pelnor's claim based on pro-rata allocation is legally erroneous and arbitrary.

The pro-rata allocation argument incorrectly borrowed by First State from *Arceneaux*[35] is a disingenuous "straw man" argument. First States no case that has ever applied either *Arceneaux (2011)*[36] or *Arceneaux (2016)*[37] to an "ultimate net loss" umbrella policy. At least five crucial differences distinguish this case from the result and reasoning in *Arceneaux.* In rejecting First State's basis for denying Pelnor's claim, Judge Ashe corrected ruled:

> As is readily apparent from an examination of the insurance policies at issue, *Arceneaux II* is not applicable here because the First State policy does not include a duty to defend. Instead, First State's liability for Pelnor's legal expenses arises from its obligation to indemnify Pelnor for its "ultimate net loss," which by definition and stipulation, includes those expenses Pelnor incurred in defending against Sentilles's claim and Avondale's crossclaim. Given the policy language in

---

[35] *Arceneaux v. Amstar Corp.*, 200 So. 3d 277, 279., 15-0588, p. 3 (La. 9/7/16).

[36] *Arceneaux v. Amstar Corp.,* 66 So.3d 438, 441, 2010-2329 (La. 7/1/11).

[37] *Arceneaux v. Amstar Corp.*, 200 So. 3d 277., 15-0588 (La. 9/7/16).

> play here, there is no rationale for limiting First State's obligation for the payment of Pelnor's defense costs to those incurred in the post-tender/pre-amendment period based on First State's time-on-the-risk.[38]

Judge Ashe was legally correct for the assigned reasons and other reasons as well.

*Arceneaux* Distinction 1 - First State was the only insurer with time on the risk that created Pelnor's ultimate net loss.

In *Arceneaux*, the insurer proved the existence of "other insurance" or policy periods when the insurer seeking pro-rata allocation of defense costs under a "duty to defend" was "not on the risk." Based on the Policy language here, the insured "risk" was not the filing of a claim in pleadings against Pelnor, but rather the "ultimate net loss" sustained by Pelnor to settle the claim as defined on September 5, 2024.

Here, First State was the only insurer "on the risk" for the "ultimate net loss" incurred by Pelnor, an outcome and legal context completely distinguishable from *Arceneaux*. When Pelnor settled this lawsuit on September 5, 2024, with Robert Sentilles, the only claim asserted by Plaintiff against Pelnor was the claim asserted in the Third Supplemental Complaint that limited the "exposure" period and the

[38] ROA 25-30653.15708.

"occurrence" to First State's policy period spanning 1973 to 1976. The "settlement payable" and "legal expenses" became an Ultimate Net Loss that then triggered First State's indemnity obligation contained in its Umbrella Liability Policy because the only "ultimate net loss" arise from an "occurrence" during the First State policy period. **When triggered, First State was the only insurer "on the risk" of what was settled and First State has not proven that any other insurance was available to Pelnor for the "ultimate net loss" or the "legal expenses" as defined in Condition H of the Policy.**[39] Moreover, First State's payment of the entire settlement as an indemnified "ultimate net loss", without offset, division or reduction, shows that no other insurance covered the "ultimate net loss".

*Arceneaux* Distinction 2 - First State, not Pelnor, is seeking the "windfall" regulated by the court's policy decision in *Arceneaux*.

The "windfall" created for the insured that concerned the court in *Arceneaux*[40] requiring pro rata allocation of the defense obligation does not exist here. First State does not argue that the indemnified settlement

[39] ROA25-30653.15370.

[40] *Arceneaux*, 200 So.3d at 286.

payable by Pelnor as an "ultimate net loss" was subject to offset or division based on other available insurance. First State was the only party that benefitted from Pelnor's defense of the settled claim and the "legal expenses" incurred because First State insured all of the "risk" that resulted in either a settlement or an unfavorable adjudication of Pelnor's liability. First State submitted no evidence showing that any of the "legal expenses" incurred by Pelnor did not benefit First State regarding the settlement costs transferred contractually to First State as an indemnified "ultimate net loss". As distinguished from *Arceneaux*, First State has neither identified nor provided any evidence whatsoever that any of the indemnified "legal expenses" were legal expenses incurred to defend claims only outside of First State's coverage period. First State, not Pelnor, is seeking the "windfall" here, which again distinguishes the applicability of *Arceneaux*'s pro-rata allocation rule to the facts and circumstances of this dispute.

***Arceneaux* Distinction 3 - The "ultimate net loss" policy language in First State's Policy was not at issue in *Arceneaux*.**

The ruling in *Arceneaux* was specific to the policy language before

the Court.[41] The Policy language contained in First State's Umbrella Liability Policy is different from the language contained in the *Arceneaux* "duty to defend" primary liability insurance language. Pelnor's claim for "legal expenses" does not arise from a "duty to defend" applicable to primary insurance, but rather from First State's obligation to indemnify Pelnor for a "settlement payable" and "all loss expenses and legal expenses (including attorneys' fees, courts costs and interests on any judgment or award)". The clear and unambiguous language in the Umbrella Liability Policy does not include or provide for any "division" or "offset" for the "legal expenses" component of an indemnified "ultimate net loss". The only policy language that permits offset is Condition H (Other Insurance) of the Policy conditions that requires Pelnor to prove other insurance applicable to the indemnified "ultimate net loss", not hypothetical insurance applicable to a duty to defend. Here, after the settlement was paid by First State, the only remaining "net loss" was the "legal expenses".

---

41 *Arceneaux,* 200 So.3d at 286.

## *Arceneaux* Distinction 4 - First State cannot rely on the allegations in the pleadings that resulted in pro-rata allocation in *Arceneaux* in misconstruing its Umbrella Liability Policy.

First State misrepresents its Umbrella Liability Policy by suggesting that the allegations of the original Complaint authorize re-allocation by relying entirely on case citations where primary liability insurers owed a "duty to defend" spanning multiple policy periods. First State does not and cannot reasonably dispute that the Umbrella Liability Policy issued by First State to Pelnor is an "ultimate net loss" indemnity policy per *Meloy v. Conoco, Inc.*, 504 So.2d 833, 839 (La.1987) that does not contain a duty to defend at the commencement of litigation based on allegations of liability, but rather requires the payment of indemnified "legal expenses" as an indemnified "ultimate net loss".[42] The Supreme Court in *Meloy* ruled **"[t]he allegations of the complaint against the indemnitee are irrelevant to the indemnitor's obligation to pay**. Rather, the terms of the indemnity agreement govern the obligations of the parties." Thus, the allegations of the Complaint cannot be used by First State to deny any payment for indemnified "legal expenses" to Pelnor based on pro-rata allocation in "duty to defend" arising from allegations

---

[42] ROA 25-30653.15355- ROA.25-30653.15370.

in the original pleadings. The Policy language here makes the indemnity obligation a single and indivisible obligation because the "settlement payable" was First State's obligation without credit or offset.

*Arceneaux* Distinction 5 - The definition of "occurrence" in *Arceneaux* that limited an insurable occurrence to "in the policy period" was deleted by endorsement in the First State Policy, which creates a crucial distinction between *Arceneaux* and this case.

The decision in *Arceneaux* was based on the finding that the insurer had "not contracted to pay defense costs for occurrences which took place outside the policy period."[43]

The First State Policy here does not tie "occurrence" to First State's policy period. The Policy provides that "[t]he Company agrees to indemnify the insured for ultimate net loss… on account of (a) …For damages…, because of personal injury… which occurs during the policy period, …, caused by an occurrence." The Policy, in Endorsement #3, goes on to define an "Occurrence" as "all personal injury … arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence".[44]

---

43 *Arceneaux*, 200 So.3d at 285.

44 ROA 25-30653.15364

Intentionally deleted from the definition of "Occurrence" was that the "continuous or repeated exposure to conditions" which "shall be considered as arising out of one occurrence" shall take place "during the policy period." First State's deletion of this language, "during the policy period," by endorsement, contradicts First States's arguments. Furthermore, First State's policy language is consistent with Louisiana's treatment of long-latency occupational disease, such as mesothelioma including this Court's prior ruling that found a bodily injury from mesothelioma is an indivisible injury that cannot be delineated.[45] A reasonable interpretation of the policy is that any continuous or repeated exposure which occurs during the policy period triggers that policy for all continuous or repeated exposure even beyond the policy period.

First State tries to blunt the deletion by endorsement that an "occurrence" take place in "the policy period" by arguing that "personal injury" must occur during "the policy period". First State's argument entirely attempts to interpret this policy language out of context. Each provision in the policy must be interpreted in light of the other provisions so that each is given meaning; one provision of the insurance contract

[45] ROA 25-30653.15393- ROA.25-30653.15399.

should not be construed separately at the expense of disregarding other provisions.[46] The definition of "Personal Injury Liability" only defines the nature of liability covered by the insurance, it does not define temporal conditions or facts that create the insured's covered liability.

The definition of "occurrence" is what defines the temporal conditions or facts that trigger coverage from a standpoint of time. First State astonishingly cites *Arceneaux*, contrary to the argument made here, which squarely holds that it is the "occurrence that triggers coverage under an insurance policy.[47] First State does dispute that factually that Plaintiff sustained personal injury during its policy period or that Plaintiff sustained bodily injury during any policy period other than the First State policy period – First State paid 100% of Pelnor's settlement.

Additionally, First State is trying to re-write the Policy retrospectively to add a requirement that does not exist in the policy language. First State is asking the Court to apply the requirement of a personal injury "which occurs **only** during its policy period" and add the

---

[46] *Green v. Johnson*, 241 So.3d 1188, 1192, 2016-1525 La.App. 1 Cir. 1/10/18, 5 (La.App. 1 Cir., 2018)

[47] *Arcneneaux,* 200 So.3d at 282.

word "only" by interpretation to existing policy language that does not contain the limiting word "only". At best, First State's argument does nothing more than create an ambiguity in the Policy that is requirement by law to be construed against First State.[48] In sum, the limiting policy language specific to an insured "occurrence" in *Arceneaux* is not applicable to the definition of "occurrence" contained by endorsement in the First State policy.

## IV. FIRST STATE WAIVED ITS COVERAGE DEFENSES BY PUTTING ITS INTERESTS AHEAD OF ITS INSURED'S INTERESTS.

When a person enters an insurance contract, the insurer provides protection against financial loss for profit. An insurance company is a legal entity which combines premiums paid by two or more persons or firms through actual or promised contributions to a fund, out of which claimants are paid their losses. By virtue of an insurance contract, the risk of loss is transferred from the insured to the insurer. Under the terms of the contract, the insurer is bound to compensate the insured and claimant for losses covered by the insurance policy, as it is interpreted by

---

[48] *Kottenbrook v. Shelter Mut. Ins. Co.*, 69 So.3d 561, 563, 46,312 La. App. 2 Cir. 5/18/11, 3 (La. App. 2 Cir., 2011)

statutes and jurisprudence. Thus, an insurance company is a professional risk bearer. Society benefits because claimants are restored to production, tax revenues are increased, and welfare benefits are reduced. From the perspective of the insured, the risk, uncertainty, and fear of insolvency are reduced or alleviated. The purchase of insurance transfers the risk of loss to the insurer, who then becomes obligated to deal fairly and in good faith with the claimant.[49]

By agreeing the any risk to Pelnor created by Pelnor's settlement with Plaintiff was transferred by indemnity to First State as an "ultimate net loss" as defined by the Policy, without division or offset or reduction, First State, by operation of law, has waived any argument that the indemnification obligation for "legal expenses" is divisible, subject to reduction or non-payable based on any coverage defenses. To hold otherwise creates scenarios contrary to insurance law and absurd consequences in the context of contractual risk transfer created by insurance agreements. To apply "divisibility" to one component of indemnified "ultimate net loss" and "indivisibility" to another component

[49] *Hebard v. Dillon*, 699 So.2d 497, 501, 97-0221 La. App. 4 Cir. 9/3/97, 2 (La. App. 4 Cir.,1997) (Plotkin, J. dissenting)

of "ultimate net loss" is simply arbitrary risk transfer avoidance by an insurer.

It is undisputed that, as Pelnor's indemnitor, all risk created by Pelnor's settlement with Plaintiff was contractually transferred to First State, making the First State the sole stakeholder with respect to settled claims asserted against Pelnor. It is undisputed that undersigned counsel retained by Pelnor has defended this action since the action was commenced, which means that First State is the only stakeholder that benefits from the defense that was subsidized by Pelnor in this civil action. No party, insurer or insured benefitted from Pelnor's defense of the settled claim other than First State if First State held all of the risk that resulted in either a settlement entered into by Pelnor or an unfavorable adjudication of Pelnor's liability. First State should be required to pay for the defense that First State has used to leverage its own liability that was transferred from Pelnor to First State in the Policy.

In *Steptore v. Masco Constr. Co.,*[50] the Louisiana Supreme Court enumerated the elements of an insurer's coverage waiver as follows: (1) an existing legal right; (2) knowledge of the existence of that right; and

---

[50] 93–2064 (La.8/18/94), 643 So.2d 1213

(3) either (a) an actual intention to relinquish the right, or (b) conduct so inconsistent with the intent to enforce the right so as to induce a reasonable belief that the right has been relinquished.[51] In order to support a finding of waiver of the right to enforce a policy provision, the insured must also demonstrate prejudice, either actual or presumptive, as a result of the insurer's actions. The court in *Steptore* held that an insurer who unconditionally undertakes the defense of the insured with knowledge that it has a coverage defense waives the right to enforce that defense.[52] The court recognized that prejudice arises when a conflict of interest exists between an insurer and its insured, reasoning that "waiver principles are applied stringently to uphold the prohibition against conflicts of interest between the insurer and the insured which could potentially affect legal representation in order to reinforce the role of the lawyer as the loyal advocate of the client's interest."[53]

Under Louisiana law, an insurance company is held to a high fiduciary duty to discharge its policy obligations to its insured in good

[51] 93–2064 at p. 4, 643 So.2d at 1216.

[52] *See* 15 William Shelby McKenzie & H. Alston Johnson, *Louisiana Civil Law Treatise: Insurance Law and Practice* § 5 (3d Ed.2006) ("*McKenzie & Johnson*") (citing *Steptore, supra*).

[53] *Steptore,* 93–2064 at p. 4, 643 So.2d at 1216;

faith.[54] First State obtained a financial benefit from the defense provided by Pelnor and the indemnified legal costs expended because the leverage that created the settlement cost that was ultimately transferred to First State arose completely because of Pelnor's defense. By not agreeing to indemnify Pelnor for those legal expenses, First State created a conflict of interest with its its insured because the insured ends up paying a cost for a result that provided financial benefit only to First State. In the end, First State is acknowledging that it was on the risk for a settlement but is imposing on Pelnor the cost of defending First State's risk. When First State intentionally and purposefully used Pelnor's defense of the claim to manage its transferred settlement risk and obtain a financial benefit, that conduct was so inconsistent with the intent any to enforce coverage defenses applicable to Pelnor's as to induce a reasonable belief that any coverage defenses had been relinquished.

When such a conflict of interests arises and the insurer has knowledge of facts indicating noncoverage, it must obtain a nonwaiver

[54] See, *Pareti v. Sentry Indem. Co.*, 536 So.2d 417, 423 (La. 1988)

agreement to reserve its rights.[55] First State did not obtain a non-waiver agreement from Pelnor when Pelnor settled with Plaintiff with First State's authority, knowledge and agreement to fund Pelnor's settlement costs as an indemnified "ultimate net loss". First State presents no such evidence of a non-waiver agreement being executed by Pelnor.

In the end, because of its obligation to indemnify Pelnor for all settlements costs, First State settled the case using Pelnor's attorneys and defense to negotiate the settlement of both First State's and Pelnor's potential liability with Plaintiff. The defense that led to the outcome for First State is not divisible insofar as the defense's contribution to the outcome acceptable to First State. First State cannot and does contend that the "litigation expenses" paid by Pelnor that remains unreimbursed to this date by First State in any way prejudiced First State. To the contrary, the defense provided by Pelnor's attorneys only benefitted First State, which was able to negotiate a settlement if all liabilities, including its indemnified liability and its direct-action liability, based on the strength of the defense and the risk of litigation for Plaintiff created by

[55] *Foret v. Terrebonne Towing Co., Inc.,* 632 So.2d 344, 347 (La. App. 1 Cir., 1993)

Pelnor's merits defense of this civil action. To not reimburse Pelnor for all "legal expenses" as a component of an indemnified "ultimate net loss" that ultimately benefitted only First State is transfer risk avoidance on the part of First State, contrary to the contractual and financial interests of the insured, Pelnor, which creates financial harm to Pelnor and a conflict of interest between First State and its insured.

## V. THE DISTRICT COURT'S DENIAL OF PELNOR'S CLAIM FOR STATUTORY PENALTIES UNDER LA. R.S. 22:1892 WAS LEGALLY ERRONEOUS AND AN ABUSE OF DISCRETION.

"A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts."[56] In denying and dismissing Pelnor's claim for statutory penalties under La. R.S. 22:1892, the District Court committed an abuse of discretion by relying on erroneous conclusions of law and misapplying the law to the facts.

Pursuant to La. R.S. 22 :1892 I.(1)(a), "An insurer, including but not limited to a foreign line or surplus line insurer, owes to its insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to

---

[56] *In Re Volkswagen of America, Inc.* 546 F.3d 304, 309 (5th Cir. 2008).

settle claims with the insured or the claimant, or both." The statutory duty of good faith is an outgrowth of the contractual and fiduciary relationship between the insured and the insurer, and the duty of good faith and fair dealing emanates from the contract between the parties.[57]

In every case, under Louisiana law, the insurance company is held to a high fiduciary duty to discharge its policy obligations to its insured in good faith.[58] The defining characteristic of a fiduciary relationship is the special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor. A fiduciary cannot further his own interests and enjoy the fruits of an advantage taken of such a relationship and must make a full disclosure of all material facts surrounding the transaction that might affect the decision of his principal.[59]

---

[57] *Smith v. Citadel Insurance Company*, 285 So.3d 1062, 1069, 2019-00052 La. 10/22/19, 9–10 (La., 2019).

[58] *Kelly v. State Farm Fire & Cas. Co.,* 169 So.3d 328, 341, 2014-1921 La. 5/5/15, 20 (La.,2015).

[59] *Terrebonne Concrete, LLC v. CEC Enterprises,* LLC, 2011-0072, 10 (La. App. 1 Cir. 8/17/11), 76 So.3d 502, 509–10.

A. First State has violated La. R.S. 22: 1892 B.(1)(a),

Under La. R.S. 22:1892(A)(1), "All insurers issuing any type of contract, other than those specified in R.S. 22:1811, 1821, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest." Under La. R.S. 1892 B.(1)(a), "Except as provided in Subparagraph (b) of this Paragraph, failure to make payment within thirty days after receipt of satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4) of this Section, respectively, or failure to make the payment within thirty days after written agreement or settlement when the failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, plus any proven economic damages sustained as a result of the breach, or one thousand dollars, whichever is greater, payable to the insured, or

in the event that a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due, plus any proven economic damages sustained as a result of the breach, as well as, in either instance, reasonable attorney fees and costs."

Following Pelnor's evidence at trial, showing more likely than not, that First State's denial of Pelnor's claim for indemnified "legal expenses" was arbitrary and capricious and without probable cause, the District Court ruled that "First State should not be subject to penalties for exercising its rights to seek review of this Court's ruling, when it has not presented frivolous arguments, such as those clearly foreclosed by controlling legal authority."[60] This ruling on statutory penalties does not correctly apply controlling Louisiana law to the record facts and therefore is an abuse of discretion that warrants reversal by this Court. Moreover, the failure to award penalties is irreconcilable with the legal findings made by the District Court in ruling on the parties' cross motions for summary judgment.

---

[60] ROA.25-30653.15217-ROA25-30653.15218.

The District Court, in its ruling on cross motions for summary judgment specifically found has found no ambiguity in First State's policy that was reasonably relied upon by First State to deny Pelnor's unpaid "pre-tender" "legal expenses in the amount of $236,000. The District Court found, as a matter of law and contract interpretation, that First State's "tender" requirement is not applicable to the First State "ultimate net loss" indemnity policy that clearly and unambiguously contains no duty to defend.".[61]

On January 20,2025, the District Court made a ruling on the cross motions for summary judgment filed by Pelnor and First State deciding legal coverages issues that are the subject of this Appeal. This ruling was a stipulated trial exhibit during the trial of Pelnor's claim for statutory penalties. In this ruling, the District Court expressly rejected First State's "tender" requirement as a basis to deny Pelnor's claim pm the basis that First State's obligation to indemnify Pelnor for "pre-tender" "litigation expenses" is unambiguous.

In ruling on summary judgment that First State's obligations to Pelnor were "unambiguous", the District Court ruled that First State's

---

[61] ROA 25-30653.15707.

policy is something is expressed so clearly that it can only be interpreted in one way, leaving no room for doubt, confusion, or misinterpretation, which is the definition of "unambiguous".[62] By holding that the First State Policy unambiguously provided coverage, notwithstanding First State's claims denial, the only reasonable inference drawn from such a finding is that no doubt or confusion existed in any reasonable mind as to First State's mis- interpretation of its own policy language to the financial prejudice of Pelnor, which continues in this Court. Such a finding can only be a finding of an arbitrary or capricious claims denial of Pelnor's claims for indemnified "legal expenses".

Moreover, when ruling upon First State's "pro-rata allocation" position to deny Pelnor's claim for post-tender indemnified "legal expenses", the District Court ruled ruled "Given the policy language in play here, **there is no rationale** for limiting First State's obligation for the payment of Pelnor's defense costs to those incurred in the post-tender/pre-amendment period based on First State's time on the risk."[63] When the District Court found "no rationale" for First State's legal

[62] ROA25-30653.15707.

[63] ROA25-30653.15708.

position, the only reasonable inference drawn from this ruling is that is that First State's claims decision had no the fundamental logical reason, justification, or underlying explanation for a decision, belief, or action, which is the definition of "rationale". First State's lack of a "rationale", as found by the District Court as a matter of law, in denying Pelnor's claim for legal expenses is the very definition of "arbitrary".

The District Court's denial of statutory penalties in light of its summary judgment ruling fails to apply the controlling law to the record facts and the District Court's own summary judgment ruling. The Louisiana Supreme Court, the highest court in Louisiana, had held that when there is a dispute over the extent of coverage afforded by an insurance policy, the insurer bears the risk of misinterpreting its own policy and will be liable for penalties for its errors.[64] The Court in *Carney* specifically ruled that an insurer "must take the risk of misinterpreting its policy provisions," and that, if an insurer "errs in interpreting its own insurance contract, such error will not be considered as a reasonable ground for delaying payment of benefits, and it will not relieve the

[64] *Carney v. Am. Fire & Indem. Co.,* 371 So.2d 815, 819 (La.1979).

insurer of the payment of penalties and attorney's fees."[65] "In other words, insurers should not have their policy provisions interpreted at the expense of the insured, especially when they are charged with knowledge of their policy's contents."[66]

At the trial of statutory penalties, First State did not call a single witness to explain or justify its claims denial considering the District Court's ruling on summary judgment that found no ambiguity in First State's policy to support First State's denial of Pelnor's claim. The argument of First State's counsel is not record evidence that can be considered either by the District Court or this Court. First State did not produce evidence from a witness showing an ambiguity relied upon or a judicial decision that abrogated its own policy language. First State called no witness who testified about other insurance available for the "ultimate net loss" sustained by Pelnor to be indemnified by First State. First State called no witness to show any prejudice sustained by First State that was caused by Pelnor.

---

[65] *Id.* (citing *Albert v. Cuna Mut. Ins. Soc'y,* 255 So.2d 170 (La. App. 3 Cir.1971)).

[66] *Louisiana Bag Co., Inc. v. Audubon Indem. Co.*, 999 So.2d 1104, 1117, 2008-0453 La. 12/2/08, 19–20 (La.,2008)

Thus, the District Court failed to apply the controlling law of Louisiana to First State's denial of Pelnor's claim based on a misinterpretation of unambiguous policy language

The *Lacoste Aviation*[67] case cited by the District Court as a basis to deny statutory penalties involved a dispute over the phrase "immediate repair" in the context of a property damage claim when foreign object debris caused damage to an airplane. The federal district court did not hold that the right to future appellate litigation warranted a denial of statutory penalties. Further, there was disagreement as to whether "immediate repair" meant that the policy covered repairs needed immediately after suffering damage or the discovery of the suffered damage.[68] Ultimately, both ambiguities were decided in favor of the insured, but the court determined that the insurer's interpretation of an ambiguous policy provision was reasonable and in good faith and did not allow the insured to recover bad faith penalties, under the specific facts and circumstances presented in that particular dispute.[69]

---

[67] *Lacoste Aviation, LLC v. StarStone Nat'l Ins. Co.*, 719 F. Supp. 3d 502, 505 (E.D. La. 2024).

[68] *Id.* at 510.

[69] *Id.* at 511-513.

Here, the District Court did not find that First State relied on an ambiguous policy provision to deny Pelnor's claim that could have gone either way. The District Court here ruled that First State based its claims denial on policy provisions that left no doubt that Pelnor was entitled to the claim submitted based on policy language contained in the First State policy written by First State.

With a unilaterally imposed requirement of tender wholly manufactured by First State, First State has financially penalized Pelnor for not engaging in action that the District Court ruled was expressly and unambiguously prohibited by First State's own insurance policy. To ignore a provision "that leaves no doubt" is the very definition of arbitrary, capricious and without probably cause.

Moreover, as a matter of law, an insurer's right to appellate review does not somehow immunize an insurer from a statutory violation of La. R.S. 22:1892 as found by the District Court. An insurer has a continuing duty of good faith and fair dealing that extends throughout the litigation period with its insured.[70] If an insurer takes a litigation coverage position that is arbitrary and capricious, the insurer cannot avoid the

---

[70] *Sher v. Lafayette Ins. Co.*, 988 So.2d 186, 199, 2007-2441 La. 4/8/08, 14 (La., 2008).

imposition of statutory penalties provided by La. R.S. 22:1892 based on further potential appellate litigation. First, neither La. R.S. 22:1892 nor any applicable jurisprudence recognizes such a defense. Second, recognition of such a defense would create terrible judicial policy by encouraging unreasonable insurers to continue litigation over arbitrary and capricious denials of claims simply to prevent the imposition of statutory penalties. No insurer would ever be found liable for statutory penalties if the insurer can immunize its bad behavior by unilaterally exercising appellate rights in furtherance of its bad behavior. An insurer's doubling down by continuing to misinterpret policy provisions that leave no doubt as to an insured's right to payment of a claim is exactly what penalties are designed to prevent.

Finally, the District Court's ruling that an insurance company is in good faith unless their denial of a claim is "clearly foreclosed by controlling legal authority" has no basis in Louisiana law. In the *Howell* case[71] cited by the District Court, the court found that an ambiguity existed regarding the word "operated" in the context of "owned and/or

[71] *Howell v. Am. Cas. Co. of Reading, Pennsylvania*, 691 So.2d 715, 727 (La. App. 4th Cir. 3/19/97).

operated watercraft" and no court had found a lack of ambiguity in the exclusion. **While "probable cause" can be based on an ambiguity to support a claims denial, no court has ever ruled that an insurer avoids a finding of bad faith after misinterpreting a policy provision founds by the Court to be unambiguous.**

The primary and controlling law and evidence applicable to this trial is the law between the parties, which is the Umbrella Liability Policy issued by First State to Pelnor and the clear and unambiguous Policy language.[72] The absence of prior reported decisions where an insurer has required a tender in not paying a claim owed under an "ultimate net loss" umbrella policy, despite an express policy condition prohibiting tender, is not a fact or point that reasonably or legally supports First State's arbitrary denial of Pelnor's claim for unpaid "legal expenses". To the contrary, the lack of a prior case where a court has approved First State's position applicable to an "ultimate net loss" Policy means that First State is taking a position adverse to Pelnor, its insured owed good faith as an extracontractual duty, and contrary to its own policy langue, that is unsupported by case law. The insurer, not the

[72] ROA25-30653.15355- ROA.25-30653.15370.

insured, is required to show a legal position consistent with controlling law when the policy language is found to be unambiguous and against the claims denial made by the insured.

Moreover, the District Court cited this Court's decision in *Vesta Ins. Co. v. Amoco Prod. Co.*,[73] in its summary judgment ruling[74], a case that applied an "ultimate net loss" insurance policy and found that litigation costs and expenses are built into the determination of an "ultimate net loss". First State brought no witness and provided no factual basis justifying its failure to pay Pelnor's claim considering this decision, that was never mentioned by the District Court in denying Pelnor's claim for statutory penalties.

First State has now financially penalized and continues to punish Pelnor for not tendering the case to First State when the Policy itself unambiguously states that "the Company shall not be called up to assume … defense of any claim made or proceedings instituted against the insured."[75] Pelnor in its summary judgment motion showed that First State's penalty imposed on Pelnor was unreasonable based on

[73] *Vesta Ins. Co. v. Amoco Prod. Co.,* 986 F.2d 981, 989 (5th Cir. 1993).

[74] ROA 25-30653.15706

[75] ROA.25-30653.15370.

Policy language and First State still has not paid the claim. The District Court agreed and told First State on January 18, 2025 that its "ultimate net loss" insurance is clear and unambiguous is not containing a duty to defend that could be used to impose a tender requirement on Pelnor as a basis to deny the claim.[76] First State had satisfactory and documented "proof of loss" arising from Pelnor's unpaid "loss expenses and legal expenses" submitted by Pelnor to First State no later than January 20, 2025.[77] First State still has not paid the claim for "legal expenses" and was the only party that ultimately benefitted from the defense of this claim based on the liability risk voluntarily transferred to First State in exchange for a premium payment.

First State has now disclaimed that the Policy contains a "duty to defend",[78] but relies entirely on "duty to defend" cases to arbitrarily not pay Pelnor's claim. First State simply refuses to recognize any applicable data point that should guide its claims decision. First State's intentional unwillingness to consider its own insurance policy language in denying Pelnor's claim is the definition of "arbitrary".

---

[76] ROA.25-30653.13953- ROA.25-30653.13968.

[77] ROA 25-30653.15183.

[78] Doc. 47, pp. 1-2.

If First State's coverage position in this case, based on the law between the parties contained in clear and unambiguous Policy language as properly interpreted under Louisiana law, is not arbitrary, capricious, willful ignorance, misrepresentative of policy provisions and unreasonable bad faith, then what is? A possible interpretation does not equate to a reasonable interpretation as the law requires sufficient to prevent the imposition of statutory penalties based on an insurer's bad faith.[79]

B. First State violated La. R.S. 22:1892 I.(2)

Under La. R.S. 22:1892 I.(2), "any one of the following acts, if knowingly committed or performed by an insurer or representative of the insurer, constitutes a breach of the insurer's duties of good faith and fair dealing:

> (a) A misrepresentation of pertinent facts or insurance policy provisions relating to any coverages at issue."

In construing the word "misrepresentation", "[w]ords and phrases shall be read with their context and shall be construed according to the

[79] *Haas v. Audubon Indem. Co.*, 722 So.2d 1022, 1029, 98-565 La.App. 3 Cir. 10/21/98, 12 (La. App. 3 Cir., 1998)

common and approved usage of the language."[80] Black's Law Dictionary defines "misrepresentation" as, "[a]ny manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts." The Louisiana Supreme Court referenced this definition of "misrepresentation" in *Kelly v. State Farm Fire & Cas. Co.*[81] : "[A] misrepresentation can occur when an insurer either makes untrue statements to an insured concerning pertinent policy provisions or fails to divulge pertinent facts to the insured."[82] Misrepresenting an exclusion to a coverage at issue is prohibited conduct that warrants the imposition of statutory penalties.[83]

Pursuant to La. R.S. 22:1892 I(1)(a), the insured may be awarded penalties in an amount not to exceed fifty percent of the damages sustained or five thousand dollars, whichever is greater, together with attorney fees and costs actually incurred due to the breach. Penalties are

---

[80] La. R.S. 1:3.

[81] 2014-1921 (La. 5/5/15), 169 So. 3d 328, 342.

[82] *Lacoste Aviation, LLC v. StarStone Nat'l Ins. Co.,* 719 F. Supp. 3d 502, 513 (E.D. La. 2024), *citing, Transamerica Life Ins. Co. v. Fuselier*, 378 So.3d 145 (La. App. 5 Cir. 11/29/23); *Dufrene v. Gautreau Fam., LLC*, 980 So. 2d 68, 85 (La. App. 5 Cir. 2/22/08).

[83] *Haas v. Audubon Indem. Co.*, 722 So.2d 1022, 1029, 98-565 La.App. 3 Cir. 10/21/98, 12 (La.App. 3 Cir., 1998).

imposed to discourage certain types of conduct by an insurer.[84]

The District Court ruled on this issue that "there is nothing in the record that shows that First State made "an affirmative misrepresentation or with[eld] pertinent facts from [Pelnor]." This statement is clearly erroneous.

First State denied Pelnor's claim for pre-tender indemnified "legal expenses" and financially penalized because First State represented that its insurance policy required Pelnor to tender the claim to First State for defense when Pelnor first became aware of the claim. This misrepresentation was contained in First State's answer (ROA 25-30653.15836) and motion for summary judgment (ROA 25-30653.15423-ROA 25-30653.15483) This representation made by First State to Pelnor as a condition of its policy absolutely and unambiguously misrepresented the requirements of its insurance policy, contained and set forth in Condition F – "Assistance and Cooperation", which expressly prohibited Pelnor from tendering the claim to First State and demanding or requesting a defense.

---

[84] *Sultana Corp. v. Jewelers Mut. Ins. Co.*, 860 So.2d 1112, 1118, 2003-0360 La. 12/3/03, 7 (La.,2003).

First State's attempt to enforce a "tender" requirement on Pelnor as a condition for paying Pelnor's indemnified "legal expenses" under the Umbrella Liability Insurance Policy issued by First State to Pelnor misrepresents to both Pelnor and the Court the benefits, advantages, conditions, unambiguous language and terms of the insurance indemnity policy that was purchased by Pelnor and delivered by First State to Pelnor. The requirement of a tender represented by First State herein amounts to an assertion not in accordance with the facts – specifically the Umbrella Liability Insurance Policy issued by First State, which is the law between the parties. The only reasonable inference that can be drawn from the denial of First State's claim for indemnified legal expenses is the misrepresentation of a policy condition on the part of First State that is unambiguously irreconcilable with First States's policy language.

First State misrepresented to Pelnor that it was required to tender the Sentilles case for a defense in March of 2022, with the penalty being First State having no obligation to indemnify for "legal expenses" incurred prior to March of 2022. This requirement misrepresents entirely Condition F "Assistance and Cooperation" contained in the First

State policy that prohibited Pelnor from tendering the claim to First State prior to settlement on September 5, 2024. The District Court's own ruling and interpretive findings on the cross motions for summary judgment makes the District Court's failure to find statutory violations of La. R.S. 22:1892 an abuse of discretion.

First State simply is not going to let its policy language get in the way of arbitrarily denying Pelnor's claim for indemnified "legal expenses". At trial, counsel for First State, during his sur-rebuttal argument, misrepresented the Policy condition to both Pelnor and the Court and told the Court that the Policy does not contain language that prevents a tender by the insured:

> I want to only rebut what he said and not reargument stuff -- reargue things. The express provision prohibiting tender, there's no such thing in here. We paid based on the tender of their defense costs and the demand that we pay them.

No such thing? How can such a statement be made by an insurance company's attorney considering the unambiguous language contained in the First State policy that prohibited a tender by Pelnor:

> F. Assistance and Co-operation: Except as provided in Insuring Agreement II (Retained Limit—Limit of Liability) with respect to the exhaustion of the aggregate limit(s) of the underlying policy(ies) listed in Schedule A, or in Condition I. (Underlying Insurance), the Company shall not be called upon to assume charge of the settlement or defense of any claim made or proceedings instituted against the Insured; but the Company shall have the right and opportunity to associate with the Insured in the defense and control of any claim or proceedings reasonably likely to involve the Company. In such event the Insured and the Company shall cooperate fully.

If the untruthful statement about a policy condition above by First State at the trial of this matter is not a misrepresentation of Condition F (Assistance and Co-Operation), again, then what is? The misrepresentation here is not some smoking gun document hidden but ultimately found in the bowels of an insurance company's records located in a dingy basement in Connecticut. The misrepresentation in this case was made by First State in the plain sight and hearing of a federal judge and Pelnor in federal court. Not finding a misrepresentation regarding the requirement of tender made by First State can only be the result of a clearly erroneous factual finding by the District Court.

The District Court's dismissal of Pelnor's claim for statutory penalties under La. R.S. 22:1892 should be reversed and the case should be remanded back to the District Court to decide the amount of statutory penalties to be awarded under controlling state law.

## Conclusion

The District Court's summary judgment in favor of Pelnor and the denial of First State's motion for summary judgment that became part of the Final Judgment in this matter should be affirmed. The portion of the Final Judgment denying and dismissing Pelnor's claims for statutory penalties under La. R.S. 22:1892 should be reversed and the case should be remanded back to the District Court to decide the amount of statutory penalties to be awarded under La. R.S. 22:1892.

BIENVENU, FOCO & VIATOR, LLC

By: s/David M. Bienvenu, Jr.
David M. Bienvenu, Jr., #20700
John Allain Viator, #25915
4210 Bluebonnet Blvd.
Baton Rouge, LA 70809
Phone: (225) 388-5600
Fax: (225) 388-5622

and

TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.
Barrye Panepinto Miyagi, #21794
450 Laurel Street, 8th Floor (70801)
P.O. Box 2471
Baton Rouge, LA 70821-2471
Telephone: (225) 387-3221
Facsimile: (225) 346-8049

Counsel for *Pelnor, LLC*

## Certificate of Service

I hereby certify that the foregoing pleading has been delivered to all counsel of record, either through the CM/ECF system, depositing a copy of the pleading in the United States Mail, first class postage prepaid, by hand delivery, or electronic mail.

Date: 6/24/2026

**BIENVENU, FOCO & VIATOR , LLC**

By: s/David M. Bienvenu, Jr.

David M. Bienvenu, Jr., #20700
John Allain Viator, #25915
4210 Bluebonnet Blvd.
Baton Rouge, LA 70809
Phone: (225) 388-5600
Fax: (225) 388-5622

And

**TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.**
Barrye Panepinto Miyagi, #21794
450 Laurel Street, 8th Floor (70801)
P.O. Box 2471
Baton Rouge, LA 70821-2471
Telephone: (225) 387-3221
Facsimile: (225) 346-8049

**Counsel for *Pelnor, LLC***

## Certificate of Compliance

I certify that this document complies with the requirements of Rules of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Rules of Appellate Procedure 32(f), this document contains 13,405 words. I further certify that this brief complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in Microsoft Word using 14-point Century Font.

**BIENVENU, FOCO & VIATOR, LLC**

By: s/David M. Bienvenu, Jr.

David M. Bienvenu, Jr., #20700
John Allain Viator, #25915
4210 Bluebonnet Blvd.
Baton Rouge, LA 70809
Phone: (225) 388-5600

And

**TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.**
Barrye Panepinto Miyagi, #21794
John P. Murrill, Bar #23878
Amy C. Lambert, Bar #24348
450 Laurel Street, 8th Floor (70801)
P.O. Box 2471
Baton Rouge, LA 70821-2471
Telephone: (225) 387-3221
Facsimile: (225) 346-8049

Counsel for *Pelnor, LLC*